IN THE MIDDLE DISTRICT COURT OF THE UNITED STATES
AT NASHVILLE, TENNESSEE

MATTHEW MARBLE

    Plaintiff
                              NO.    3:15 CV 0508
                                             Judge Sharp
                                             Magistrate Judge Bryant
                                           JURY DEMAND

v.

STATE OF TENNESSEE ET AL

    Defendants

---

# **FIRST AMENDED COMPLAINT**

---

Now comes the Plaintiff, Matthew Marble, by and through counsel and files this First Amended Complaint consistent with this Court's Memorandum (Doc. No. 83, PageID # 722) and Order (Doc. No. 84, PageID # 732) filed January 12, 2016 which dismissed the Defendant Camelot and denied dismissal of the Complaint on the Rooker-Feldman doctrine; and this Court's order on the Motion for Clarification filed August 10, 2016 (Doc. 87, PageID# 739) instructing plaintiff to file the First Amended Complaint.

## **PARTIES**

1. The plaintiff is Matthew Marble. He is an adult citizen of the State of Michigan. Mr. Marble suffers from cognitive and development delays such that it creates a substantial limitation on his major life activities. He qualifies as a disabled person under Americans with Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act ("Section 504").

S:\doc a-k\DuBoise, Bobbi  4-10062\Pleadings Federal\2015 Oct first amended complaint\160904 - first amended complaint as ordered .docx

a. Plaintiff Marble is the father of H. S.   H.S. is a minor female child born August 8, 2012.  She was born out of wedlock in the State of Tennessee.  At the time of her birth, Matthew Marble executed a Voluntary Acknowledgement of Paternity (VAP) which under the authority of Tenn. Code Ann. § 24-7-113 makes him the legal father of this child.   No further court action is required in the State of Tennessee to confirm that legal relationship.  The voluntary acknowledgement of paternity was provided to DCS.

b. Plaintiff Marble suffered the devastating loss of his grandfather in 2004 and developed the manifestations of ADHD (Attention Deficit Hyperactive Disorder). By 2008, he had an IEP (individualized educational plan) at his school which also acknowledged that he had suffered from seizures.   He suffers from cognitive disabilities and was unable to complete his formal education.

c. During the events alleged in this Complaint, DCS offered the testimony of two mental health experts, Jerri Cross and Eric MacLeod, Ph.D.[1]:  (1) Jerri Cross is the regional director of Health Connect America and a licensed professional counselor.  She performed a mental health assessment of Plaintiff and stated that he suffered from "cognitive distortion" due to a head injury during his youth and a subsequent seizure disorder.  (Testimony, pg. 202).  He has difficulty processing information.   Jerri Cross diagnosed Plaintiff Marble with post-traumatic stress with depressive disorder and she deferred on "pervasive developmental disorder"

---

[1] Defendant DCS has possession of these transcripts which are part of a confidential proceeding.

S:\doc a-k\DuBoise, Bobbi  4-10062\Pleadings Federal\2015 Oct first amended complaint\160904 - first amended complaint as ordered .docx

and "cognitive learning disorder." (pg. 205) She admitted the pervasive developmental disorder was on the autism spectrum and that diagnosis would have to be done by a psychologist. (pg. 213) She did not make a recommendation to seek the advice of a psychologist to rule out autism prior to beginning individual counseling. She admitted that she did NOT do a parenting assessment and had never observed him with his daughter. She also admitted that she did NOT know what kind of support system he had. (pg. 206) She also did NOT recommend any "relapse prevention program" because he had been "clean and sober" for two years. (pg. 212) This mental health assessment was done in January 2014. (2) DCS also took the testimony of Eric MacLeod, Ph.D. who had provided individual counseling for Plaintiff Marble in 2010, in 2013, and again in 2014. As early as 2010, Plaintiff Marble had experienced anxiety and depression and suffered from tightness in his chest. (Deposition testimony of MacLeod, pg 13) MacLeod testified that he was surprised that another mental health professional had diagnosed Plaintiff Marble with post traumatic stress. (pg. 16) In 2014, Plaintiff Marble presented with a lot of anxiety and the fear of dying and abandonment. (pg. 16) MacLeod was asked if Plaintiff Marble needed continuing treatment and he stated, "Well, I think that he probably does either to help him, you know, become a better person in terms of interaction with other individuals. Or, should he wind up with custody of his children, to, you know, better understand how to become a parent, especially considering he has not had that opportunity for some time. Conversely, if he fails to get custody of these kids, I

think that he will be probably emotionally impacted in a negative way and would require some assistance with that was well. So either way, yes." (pg. 18,19) MacLeod admitted that he had no idea how Plaintiff Marble interacted with his child and so he would have no idea what was missing from his ability to parent. (pg. 19) He admitted Plaintiff Marble would benefit from "peer support." (pg. 19) MacLeod admitted that he had not performed any intelligence testing on Plaintiff Marble. (pg. 22)

    d. The biological mother of the child is Aren Stuber. She is an adult and resides in the State of Tennessee. In November 2014, she voluntarily surrendered her parental rights to the minor child to the State of Tennessee, Department of Children's Services.

2. Defendant 1 is the State of Tennessee. The State of Tennessee established the Department of Children's Services in 1994 through the enactment of TENN. CODE ANN. § 37-5-101 et seq. They shall be referred to as the State. TENN. CODE ANN. § 37-5-104 provides for the appointment of a commissioner and requires that said person be qualified by training and experience in the area of children's service. The commissioner is appointed by the Governor and serves at the pleasure of the Govenor.

3. Defendant 2 is the Tennessee Department of Children's Services. They shall be referred to as DCS. This agency, created through legislative action, receives funding from appropriations made from the State treasury and, in addition, receives and operates with funds from the United States Federal government under the Social Security Act, Title IV – E and Title IV – B (and possible other funding sources that will be discovered in the

S:\doc a-k\DuBoise, Bobbi  4-10062\Pleadings Federal\2015 Oct first amended complaint\160904 - first amended complaint as ordered .docx

course of this litigation).    Therefore, they are a State agency that is subject to Title II of the Americans with Disabilities Act (ADA), 42 U.S.C. § § 12131 – 12134.

    a.  At all times relevant to the events alleged in this Complaint, the Tennessee Department of Children's Services operated child welfare programs including family services and received financial assistance from the Administration for Children and Families, U.S. Department of Health and Human Services.

    b.  The child welfare system is a group of services designed to promote the well-being of children by ensuring safety, strengthening families, and achieving permanency.  Pursuant to Title IV-E of the Social Security Act, DCS is required to make reasonable efforts to preserve and reunify families prior to the placement of a child in foster care, to prevent or eliminate the need for removing the child from the child's home; and to make it possible for a child to safely return to the child's home.  *See* 42 U.S.C. § 671(a)(15).

    c.  To that end, families with children in custody typically participate in developing a permanency plan ("Family Permanency Plan" or "FPP") for the child and a service plan for the family, which guides the child welfare agency's work. Family reunification, except in unusual and extreme circumstances, is the permanency plan for most children.  If efforts toward reunification are not successful, the plan may be changed to another permanent living arrangement, such as adoption or transfer of custody to a relative.

    d.  Title IV E funds are an unlimited source of funds for the child welfare state agency that are termed as a "use it or lose it" funding scheme.  So long as the

S:\doc a-k\DuBoise, Bobbi  4-10062\Pleadings Federal\2015 Oct first amended complaint\160904 - first amended complaint as ordered .docx

states expend the monies granted to them, they are eligible to receive the same or more money for the following year. However, these funds are only allocated for the financial support of the foster care system. A child can only qualify as a commodity in this funding scheme if the child is removed from the home by a State agency and placed in the foster care system. The funds are NOT available for family preservation or protecting the family unit prior to removal. Nor are they available to provide resources after the child has been returned to the parent. The State of Tennessee is dependent upon securing Title IV E funds to maintain its annual operating budget and the continued employment of its staff. Therefore, the State must keep the flow of children into the foster care system to continue to receive their federal funding benefits.[2] The end result creates a "quota" of children that must be removed from the care and custody of their parents. According to the 2013-14 published budget of DCS, about 8,500 child are in foster care. The annual quota for the State of Tennessee is approximately 8,000 children.

e. In addition, the State of Tennessee child welfare agency receives a bonus in the minimum amount of $4,000 (four thousand dollars) for each child they adopt out

---

[2] The United States Department of Human Services offered for the States to individually submit "waivers" for the use of their Title IV E funds so that these funds could be used for the purposes of maintaining the integrity of the family. This opportunity closed December 31, 2014. http://www.acf.hhs.gov/programs/cb/programs/child-welfare-waivers

S:\doc a-k\DuBoise, Bobbi  4-10062\Pleadings Federal\2015 Oct first amended complaint\160904 - first amended complaint as ordered .docx

after terminating the rights of the parent.[3]  This financial incentive is authorized under Section 473A of the Social Security Act and provides motivation for the agency to terminate the rights of parents instead of complying with the public policy of Tennessee which is to reunify the child with the parent.[4]

    f.   DCS has an affirmative duty to comply with Title II of the Americans with Disabilities Act and provide an individualized assessment for the purpose of making reasonable accommodations to parents.

    g.   DCS has a written ADA policy for its employees but NO policies and no notice provisions for disabled parents under the ADA.

    h.   DCS has a duty to ensure that its contractors comply with the prohibition of discrimination in Title II and Section 504.

---

[3] Funds provided under the Adoption and Safe Families Act.

[4] The Tennessee General Assembly has established the <u>policy</u> that children should not be removed from the parents' custody unless the separation is necessary for the child's welfare or in the interest of public safety.  *Tenn. Code Ann.* § 37-1-101(a)(3) (2005), and that once children are removed, the first priority should be to reunite the family if at all possible.  Because of the prominent role that the Department of Children's Services plays in the lives of so many dependent and neglected children, the Tennessee General Assembly has explicitly imposed on the Department the responsibility to make reasonable efforts to reunify children and their parents after removing the children from their parents' home. *Tenn. Code Ann. § 37-1-166*. The Department must memorialize its efforts in an individualized permanency plan prepared for every dependent and neglected child placed in its custody. The requirements in each permanency plan must be directed toward remedying the conditions that led to the child's removal from his or her parent's custody. Reflecting the Tennessee General Assembly's understanding that the ability of parents to rehabilitate themselves depends on the Department's assistance and support, permanency plans place obligations on the Department to help parents become better able to provide their children with a safe and stable home and with consistent and appropriate care. *In re Randall B. Jr.* 2006 Tenn. App. LEXIS 630, (Tenn. Ct. App. Sept. 28, 2006)

S:\doc a-k\DuBoise, Bobbi  4-10062\Pleadings Federal\2015 Oct first amended complaint\160904 - first amended complaint as ordered .docx

i. DCS operates in the State of Tennessee with no direct oversight. T.C.A.§ 3-15-701 provided that there should be a Joint Committee on Children's Services to act as an oversight of the activities of this department "until services for children and their families have improved substantially." According to the January 2011 report of the Tennessee Comptroller, this committee was never fully formed. The act was repealed in 2011 after a parent filed a mandamus to compel the formation of the committee.

j. There is no method to report the conduct of an employee of DCS as being outside of the laws and regulations of the State, or otherwise performing in such a manner that they are in violation of the rights of the parents.

k. Lindsey Kenyon was a named defendant in the original Complaint (Doc. 1, PageID #:1). An Agreed Stipulation was entered on August 31, 2015, nonsuiting the action against her personally without prejudice (Doc. 64, PageID #: 457). At all times during the events alleged in this Complaint, she served as a caseworker or case manager for H.S. under the employment of the Tennessee Department of Children's Services and under the supervision of Commissioner James Henry. She shall be referred to as Lindsey Kenyon or Kenyon. In accordance with T.C.A. § 37-5-118 she is required to take an oath that she will execute the laws and regulations prescribed for the government of the department.

l. Lois Gregory was a named defendant in the original Complaint (Doc. 1, PageID #:1). An Agreed Stipulation was entered on August 31, 2015, nonsuiting the action against her personally without prejudice (Doc. 64, PageID #: 457). At all

S:\doc a-k\DuBoise, Bobbi 4-10062\Pleadings Federal\2015 Oct first amended complaint\160904 - first amended complaint as ordered .docx

times during the events alleged in this Complaint, she served as the supervisor for Lindsey Kenyon (case worker for H.S.) under the employment of the Tennessee Department of Children's Services and under the supervision of Commissioner James Henry. She shall be referred to as Lois Gregory or Gregory. In accordance with T.C.A. § 37-5-118 she is required to take an oath that she will execute the laws and regulations prescribed for the government of the department. Lois Gregory was involved at all stages in this matter including appearing at CFTM meetings and court appearances. Under information and belief, she approved of all communication and actions taken by Lindsey Kenyon.

m. Stacye Choate was a named defendant in the original Complaint (Doc. 1, PageID #:1). An Agreed Stipulation was entered on August 31, 2015, nonsuiting the action against her personally without prejudice (Doc. 64, PageID #: 457). At all times during the events alleged in this Complaint, she is employed by and serves as legal counsel for the Department of Children's Services. She shall be referred to as Attorney Choate or Choate.

n. Virginia Thompkins was a named defendant in the original Complaint (Doc. 1, PageID #:1). An Agreed Stipulation was entered on July 7, 2015 non-suiting the action against her personally without prejudice (Doc. 50, PageID #: 335). From July 2013 until November 2014, she served as the Court appointed Guardian ad Litem (GAL) for H.S. in the proceedings described herein. Since she was appointed by court order and received payment from the State of Tennessee for her services.

S:\doc a-k\DuBoise, Bobbi  4-10062\Pleadings Federal\2015 Oct first amended complaint\160904 - first amended complaint as ordered .docx

o. Lisa Cothron was a named defendant in the original Complaint (Doc. 1, PageID #:1). An Agreed Stipulation was entered on July 7, 2015 non-suiting the action against her personally without prejudice (Doc. 50, PageID #: 333). From November 2014 until present, she served as the Court appointed Guardian ad Litem (GAL) for H.S. in the proceedings described herein. Since she was appointed by court order and received payment from the State of Tennessee for her services.

4. ADA Title II prohibits discrimination in child welfare programs and services when those services are provided by contractors. Under Title II, the State is liable for the violations of their contractors.

5. Plaintiff Marble brings this action against the Defendants State of Tennessee and Department of Children's Services, individually and collectively under the authority of Title II of the Americans with Disabilities Act (ADA), 42 U.S.C. § § 12131 – 12134 and Section 504 of the Rehabilitation Act of 1973 (Section 504), 29 U.S.C. § 794.

6. The State of Tennessee and the Department of Children's Services have no immunity under prosecution of Title II of the ADA.

7. The acts of the Defendants served to individually and collectively violate the plaintiff's constitutional right to parent and said actors acted with reckless disregard for the limitations and disabilities of the plaintiff and with the concerted end objective of total destruction of the familial relationship between the Plaintiff Marble and H. S.

S:\doc a-k\DuBoise, Bobbi  4-10062\Pleadings Federal\2015 Oct first amended complaint\160904 - first amended complaint as ordered .docx

8. DCS sought to sever Plaintiff Marble's parental rights in order to sustain the financial scheme wherein the State of Tennessee receives federal funds for DCS's re-homing of children.

9. Under the ADA and Section 504, programs and services must be accessible to and usable by people with disabilities. *See* 28 C.F.R. Sec. 35.150(a); 45 C.F.R. Sec. 84.22(a). By implementing requirements beyond Plaintiff Marble's access and capabilities, DCS violated the ADA and Section 504.

10. Under the ADA and Section 504, programs are prohibited from using administrative methods, such as written rules, that have a discriminatory effect on individuals with disabilities. *See* 28 C.F.R. Sec. 35.130(b)(3); 45 C.F.R. Sec. 84.4(b)(4). DCS documents show that DCS discriminated against Plaintiff Marble on the basis of his disabilities, using written rules and other administrative methods to set him up for failure as stated more fully hereafter. More particularly, DCS developed a "permanency plan" (FFP) which was discriminatory and failed to accommodate his limitations.

11. Under the ADA and Section 504, programs must provide reasonable modifications in policies, practices and procedures when necessary to avoid discrimination. See 28 C.F.R. Sec. 35.130(b)(7); see also *Alexander v. Choate*, 469 U.S. 287 (1985). DCS offered NO modifications to Plaintiff Marble but, instead, put forth requirements that were beyond Plaintiff Marble's physical and mental capabilities and his financial means. Again, the defendants set him up to fail as stated more fully hereafter.

S:\doc a-k\DuBoise, Bobbi  4-10062\Pleadings Federal\2015 Oct first amended complaint\160904 - first amended complaint as ordered .docx

12. DCS demands were especially onerous for Plaintiff Marble to comply with due to geographic difficulties, especially considering that he is a Michigan resident with physical and mental disabilities.

13. The Department of Children's Services is a public entity.

14. Under 28 C.F.R. Sec. 35.130(b)(3)(i) and (ii), a public entity "may not, directly or through contractual or other arrangements, utilize criteria or methods of administration: (i) That have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability; [or] (ii) That have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities." *See also* 45 C.F.R. Sec. 84.4(b)(4)(i), (ii).

## **JURISDICTION**

15. This Court has jurisdiction in this matter under 28 U.S. Code § 1331.

## **FACTS**

16. The following sets forth in detail the history of the involvement of DCS and demonstrate the intense crusade to permanently sever the child's relationship from her father despite the fact that they had NO grounds to interrupt his parental relationship.

   a. DCS removed the child from the care of the Mother, Aren Stuber, based on an injury that occurred while the child was in her care in Tennessee. DCS did not release the child to Plaintiff Marble upon his arrival to Tennessee from his state of residence, Michigan.

b.  DCS used generalizations, presumptions stereotypes and/or patronizing attitudes about Plaintiff Marble's disabilities to justify the denial of Plaintiff Marble's natural and constitutional rights to his child in violation of the ADA.[5]

c.  From the very beginning, DCS agents participated in proceedings that lacked any individual assessment that could have led to reasonable accommodations for Plaintiff Marble.

d.  DCS failed to do an individual assessment of the Plaintiff Marble's needs and limitations as a parent in violation of the ADA and Section 504.

e.  DCS refused to consider Plaintiff Marble's extended family and their ability and willingness to do whatever was necessary to obtain custody of H.S. "The Duboise family is willing to do whatever to cooperate…Bobbi [Duboise] reports that she has an Associate Degree in Early Childhood Education [and] has training with Special Needs." (See *Infra*, June 25, 2014 CFTM Summary).

f.  DCS refused to accommodate a transfer of the child to Plaintiff Marble's Aunt Bobbi DuBoise which would have maintained the integrity of the family bond between Marble and his daughter.  In fact, DCS expressly opposed the transfer of the child to the aunt and declared that the court should have a "best interest" hearing between the Camelot Care foster parents and the child's blood relative.

---

[5] 28 C.F.R. Sec. 35.130(b) and 28 C.F.R. pt. 35, App. B "prohibit[s] exclusion…of individuals with disabilities and the denial of equal opportunities enjoyed by others, based on, among other things, presumptions, patronizing attitudes, fears, and stereotypes about individuals with disabilities.  Consistent with these standards, public entities are required to ensure that their actions are based on facts applicable to individuals and not presumptions as to what a class of individuals with disabilities can or cannot do."

S:\doc a-k\DuBoise, Bobbi  4-10062\Pleadings Federal\2015 Oct first amended complaint\160904 - first amended complaint as ordered .docx

This not only was in violation of the Father's rights under ADA, it was contrary to Tennessee law which was for DCS and the Court to give *preference* to the child's blood relative. T.C.A. § 37-2-414; T.C.A. § 37-2-403(a)(1)(A)

g. And finally, by intentionally imposing requirements beyond Plaintiff Marble's capabilities and skill, DCS created the circumstances that would allow them to pursue termination of his parental rights under the laws of the State of Tennessee and profiteer the child into foster care and then adoption. DCS created a "self-fulfilling circumstance" in which the father was doomed for failure from the beginning.

h. But for the refusal to make reasonable accommodations for the Father (after providing an individualized assessment), the Father would have been able to maintain his right to parent his daughter and participate in her life through the support of his family. The Father was never alleged to have been a risk of harm to his daughter.

17. The minor child, H.S. was born August 8, 2012 in the State of Tennessee. She was conceived in the State of Michigan, then the mother, Aren Stuber, traveled to the State of Tennessee to reside with her mother before the child was born. Plaintiff Matthew Marble is the biological father of this child and was at the hospital when the child was born. Matthew Marble was eighteen years old when this child was born. The mother was sixteen years old. As of the date of filing this complaint, both parents are adults and the mother voluntarily surrendered her parental rights in November 2014. She is not a party to this lawsuit.

S:\doc a-k\DuBoise, Bobbi  4-10062\Pleadings Federal\2015 Oct first amended complaint\160904 - first amended complaint as ordered .docx

18. Plaintiff Marble suffers from physical, cognitive, and developmental delays such that he was unable to complete a formal education and had difficulty transitioning into adulthood. He was unable to maintain employment, unable to complete a G.E.D (graduation equivalency test), and was unable to maintain independent housing. For a period of time, Plaintiff Marble utilized inappropriate substances, however, when he found out he was going to be a father (about December 2011), he stopped the use of those substances.

19. For the first eight (8) months of the child's life, Plaintiff Marble would travel to Tennessee on occasion to visit with his daughter. In addition, the Mother brought the child to the State of Michigan on at least three occasions. At those times, the minor child was also able to visit with Plaintiff Marble's extended family, including Bobbi and Will DuBoise, Jr. (the aunt and uncle of Plaintiff Marble).

20. In April 2013, Plaintiff Marble became frustrated that the Mother no longer cooperated with making time for him to visit with the infant and he went to the Juvenile Court of Sumner County, Tennessee and completed a pro se motion for visitation. This was set to be heard in Court on or about July 3, 2013.

21. In the meantime, unbeknownst to Plaintiff Marble, the Mother's conduct had become unsafe for the child, including the use of drugs and alcohol. She had also taken up a relationship with another man. Plaintiff Marble was unsure about the day-to-day care of his daughter and hoped he could get custody of her. However, he was without the resources to obtain an attorney. Plaintiff Marble still resided in the State of Michigan.

S:\doc a-k\DuBoise, Bobbi 4-10062\Pleadings Federal\2015 Oct first amended complaint\160904 - first amended complaint as ordered .docx

22. On June 23, 2013, H.S. was transported to the hospital by maternal grandmother of H.S. with a series of bruises on her face and torso.  She was also in a physical state in which it was apparent that she had suffered a head injury.  It was determined that the child had sustained this head injury while under the care of the mother.  The mother had been under the influence of drugs and alcohol at the time the child was injured.  The child was first taken to Macon County General hospital and was then transported to Vanderbilt Hospital. DCS was called to the hospital and the minor child was immediately taken into state's custody.  She was placed in the home of foster mother and foster father, a Camelot Care foster care placement.  The foster parents began receiving payments from the State of Tennessee for the care of the child.

23. Plaintiff Marble received information from the mother's aunt that his daughter had been injured and he started his trip to the State of Tennessee.   Plaintiff Marble made a phone call to DCS worker Gale Smith on his way to Tennessee who told him his daughter was in the custody of DCS and was placed in foster care.  Gale Smith did nothing to determine if Plaintiff could receive the child releasing her from state's custody.  Gale Smith did not inform Plaintiff Marble that he would be entitled to court appointed counsel if he was unable to afford an attorney or that he should immediately seek such relief from the Court.

24. Plaintiff Marble, who has limited cognitive skills, did not understand that he could have immediately sought for legal counsel to be appointed to him to protect his parental rights. However, he knew that he had a court appearance in Sumner County, Tennessee set for July 3, 2013 on his pro se motion for visitation.

S:\doc a-k\DuBoise, Bobbi  4-10062\Pleadings Federal\2015 Oct first amended complaint\160904 - first amended complaint as ordered .docx

25. On June 23, 2013, DCS filed a Petition for Legal Custody and Ex Parte Order in the Juvenile Court of Sumner County, Tennessee, the same court in which Plaintiff Marble's pro se motion had been filed. This petition detailed the events that resulted in the injury to the minor child and made NO allegations against the Plaintiff. The petition does not name Plaintiff Marble as a respondent and does not even acknowledge his existence. In this petition it stated that "due to Aren Stuber's current mental health condition, H.S. is without a parent or legal guardian." DCS therein determined that removing the children from the home and placing them in the Department's custody was necessary to ensure the children's safety. The petition was verified by DCS worker Chelsea Sorrells. The Court granted this ex parte order of custody.

26. On June 24, 2013, DCS held a meeting regarding the minor child in which the Plaintiff was not invited to attend. The notes from this meeting show that the father's name is, "Matt Marbel [sic], Father." (June 24, 2013 Child and Family Team Meeting Summary, pg. 1). Therefore, as of June 24, 2013 DCS knew that Plaintiff Marble was the Father of the child. DCS placed the child in private foster care owned and operated by Camelot Care. Father was given no notice of where his daughter was housed or who was providing care to her.

27. On or about July 3, 2013, Plaintiff Marble appeared in Sumner County, Tennessee on his motion for visitation. Judge Barry Brown of Sumner County told Plaintiff Marble that he would give him the child if he could, but that DCS had asked to transfer their action to Macon County, Tennessee. Under Tennessee law, if a child is taken into state's custody, a hearing is to be set within three days of the removal. In this case, no such hearing was

S:\doc a-k\DuBoise, Bobbi  4-10062\Pleadings Federal\2015 Oct first amended complaint\160904 - first amended complaint as ordered .docx

EVER set. On July 3, 2013, the Court did not appoint legal counsel for Plaintiff. At this Court appearance, Virginia Thompkins was appointed as the Guardian ad Litem (GAL) for H.S. under the authority of Tenn. Code Ann. § 37-1-149. Under information and believe, Virginia Thompkins had served in that capacity in the past and understood that she would be paid by the State of Tennessee and making her as a state actor in that capacity. Further, T.C.A. § 37-1-149 requires that the Court appoint someone who has received training in that capacity.

28. At this July 3, 2013 Court hearing, the Plaintiff Marble asked for visitation with his child but it was denied and he was required to take a DNA test to determine if he was the true biological father of H.S. Plaintiff Marble complied and the test was positive for paternity. He was not allowed to visit with daughter until September 2013.

29. At the July 3, 2013 hearing, Plaintiff Marble had not been appointed legal counsel and he did not have legal counsel appearing in his behalf at the hearing. No one ever explained to Plaintiff why DCS had not allowed him to have custody of his daughter since there were no allegations against him. Plaintiff Marble would later be told that he would be required to "meet the requirements of the permanency plan" and that his daughter would stay in DCS custody until he had done so. The State also submitted that he would be required to pay child support to the State of Tennessee. Since the Father/Plaintiff did not live in the State of Tennessee, he would be responsible for paying for the services in which he was required to participate. Plaintiff Marble was at all times a resident of the State of Michigan.

S:\doc a-k\DuBoise, Bobbi  4-10062\Pleadings Federal\2015 Oct first amended complaint\160904 - first amended complaint as ordered .docx

30. On or around **July 9, 2013**, DCS held a Child and Family Team Meeting ("CFTM meeting") to go over DCS's Family Permanency Plan ("FPP"). The FPP outlines what the parents and DCS must do for the file to be closed. The FPP shows that Plaintiff Marble participated in the meeting on **July 8 by telephone**, while Mother Aren Stuber participated on **July 9**, and DCS worker Gale Smith, along with Aren Stuber's parents, "participated" on **July 11, 2013**. As such, it is unclear what information Plaintiff Marble actually received by virtue of his "participation," especially given that others' participation and input occurred <u>following</u> his July 8, 2013 phone call. Plaintiff Marble was therefore without knowledge of what was discussed by others in his absence.

31. The July 9, 2013 FPP document states that Plaintiff Marble came to Tennessee when he found out that H.S. was in state's custody, and that he has the support of extended family in Michigan. The FPP also states that DCS, by then, **had a copy of the child's birth certificate** ("Mr. Marble has provided documentation to the Department in the form of Hailey's birth certificate." (July 9, 2013 FPP, pg. 9)). The FPP also states that Plaintiff Marble was working on his GED, is currently unemployed, and that "Mr. Marble **has a seizure disorder** that may affect his ability to be the sole parent." (July 9, 2013 FPP, pg. 13).

32. On July 9, 2013, DCS was on notice that Mr. Marble had a disability "that may affect his ability to be the sole parent." At this time, DCS offered no accommodation to Plaintiff Marble, nor did they perform an individual assessment of his capabilities or disabilities.

33. DCS's preemptive conclusion that Plaintiff's seizure disorder "may affect his ability to be the sole parent" without giving Plaintiff a complete independent assessment 1) was

S:\doc a-k\DuBoise, Bobbi  4-10062\Pleadings Federal\2015 Oct first amended complaint\160904 - first amended complaint as ordered .docx

discriminatory; and 2) shows that DCS was well aware of the disability of the Father. In fact, they decided to "name" it at the onset. DCS was now on notice that Plaintiff Marble should be afforded reasonable accommodations and modifications in order to effectively and safely parent his daughter. DCS was also on notice that Plaintiff Marble was the legal father of H.S. Section 504 of the Rehabilitation Act prohibits programs and services from discriminating against qualified individuals on the basis of their disability under 29 U.S.C. Sec. 794(a).

34. Upon notice that the Father might be suffering from a qualifying disability, DCS had an affirmative duty to provide an individualized assessment compliant with the ADA and Section 504. Not only did they fail to provide the assessment, they launched into an agenda to satisfy their own goal which was to obtain the child for adoption (and thusly financial incentives). The foster parents never had any intention of assisting the Father to reunite with his child.

35. The July 9, 2013 FPP states that the "specific event" that led to the child being taken into state custody had only to do with injuries inflicted upon H.S. while in the care of Mother Aren Stuber and her friends and family. (July 9, 2013 FPP, pg. 4). Plaintiff Marble was not implicated in the "specific event" leading to state custody.

36. The July 9, 2013 FPP gave Plaintiff Marble responsibilities and "action steps" required of him. These included 1) being able to demonstrate age-appropriate parenting skills with his daughter; 2) taking a parenting class to ensure that he is given the tools to effectively parent H.S.; 3) demonstrating appropriate parenting skills; 4) facilitating an assessment of his housing [in Michigan]; 5) submit to a background check; 6) that he get a job and have

S:\doc a-k\DuBoise, Bobbi  4-10062\Pleadings Federal\2015 Oct first amended complaint\160904 - first amended complaint as ordered .docx

a "significant legal means of income"; and 7) providing proof of income on a monthly basis. (July 9, 2013 FPP, pg. 10-12). DCS imposed these objectives upon Plaintiff Marble knowing that they were beyond his capabilities while providing no reasonable assistance given his limitations.

37. DCS may not "utilize criteria or methods of administration…[t]hat have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities." 28 C.F.R. Sec. 35.130(b)(3)(ii).

38. DCS offered to give the unemployed Plaintiff Marble (who does not even have a G.E.D) "literature to assist [him] with his employment skills." (July 9, 2013 FPP, pg. 12). The offer of literature was clearly insufficient "assistance" given the circumstances.

39. On September 5, 2013, DCS filed an Amended Petition stating in detail the events that had occurred resulting in the injury to the child. In this Amended Petition, DCS now made allegations against Plaintiff Marble. The petition stated that (1) he was not the legal father of the child (even though they had been provided the child's birth certificate listing Plaintiff Marble as the legal father and despite Plaintiff Marble having executed a Voluntary Acknowledgment of Paternity upon the child's birth in August 2012); and (2) that he had failed to protect the child from harm (even though DCS knew he was in the State of Michigan when the injury occurred to the child). Both statements were knowingly false statements made by DCS attorney Stacye Choate. DCS had a copy of the child's birth certificate listing Plaintiff Marble as the legal father. Further, the investigation by DCS had shown that Plaintiff Marble did not know that the child was in

imminent danger in the care of the Mother not could he have 'knowingly' failed to protect the child. This petition was not verified, but was executed by DCS attorney Stacye Choate and filed with the Juvenile Court in Macon County, Tennessee.

40. In early September 2013, Attorney Jaimee Underwood was appointed by the Juvenile Court to represent Plaintiff Marble. Attorney Jaimee Underwood ("Attorney Underwood") was paid by the Administrative Office of the Courts in Tennessee under the authority of Tenn. Supreme Court Rule 13.

41. On September 5, 2013, DCS held another CFTM meeting. As evidenced by the signature page on the September 5, 2013 FPP, all participants attended in person. These participants included Plaintiff Marble, Mother Aren Stuber, DCS worker Lindsey Kenyon, and three (3) employees of the foster care placement agency Camelot Care, Stephanie Piper, Richard Wentworth and Johnetta Jones. The Camelot Care foster parents, Dana Davis and Brandon Givens also attended the meeting.

42. The September 5, 2013 FPP also states that the "specific event" that led to the child being taken into state custody had <u>only</u> to do with injuries inflicted upon H.S. while in the care of Mother Aren Stuber and her friends and family. (September 5, 2013 FPP, pg. 3). Plaintiff Marble was not implicated in the "specific event" leading to state custody <u>whatsoever</u>.

43. The September 5, 2013 CFTM meeting participants reviewed the September 5, 2013 FPP listing Plaintiff Marble's "seizure disorder" as affecting "his ability to be the sole parent." (September 5, 2013 FPP, pg. 15). Without conducting the required individualized

S:\doc a-k\DuBoise, Bobbi  4-10062\Pleadings Federal\2015 Oct first amended complaint\160904 - first amended complaint as ordered .docx

assessment, the FPP goes on to state that "Mr. Marble has a medical condition that poses a risk to solely care for the child." (September 5, 2013 FPP, pg. 4).

    a. DCS was on notice of Plaintiff Marble's disability.

    b. DCS did not provided for an independent assessment of any reasonable accommodation to assist Plaintiff Marble in the FPP's requirements.

    c. Per the United States Justice Department, Title II of the ADA and Section 504 make it a violation for DCS to assume that the father was unable to learn how to safely care for his daughter because of his disability, and to deny him the opportunity to receive meaningful assistance from his relatives and other service providers.[6]

44. On or prior to the September 5, 2013 meeting, DCS was on notice that they should have provided Plaintiff Marble with modifications and accommodations that would have allowed him to receive custody of his daughter.

45. While on the one hand using his medical condition against him and discussing purported limitations on his ability to be a parent as a reason NOT to return the child to him, DCS simultaneously required Plaintiff Marble to miraculously "obtain/maintain housing for no less than 6 months...Matthew will pay bills for food and housing utilities on time…Matthew will provide proof of income to DCS case manager on a monthly basis." (September 5, 2013 FPP, pg. 12-13). This FPP also notes that Plaintiff Marble had not graduated from high school and was working on his GED (September 5, 2013 FPP, pg.

---

[6] Section entitled "In the Case of Sara Gordon – Massachusetts" *Infra,* First Amended Complaint, Para. 110. *Previously filed with the Court and provided to counsel.*

8). DCS knowingly gave Plaintiff Marble objectives beyond his capabilities. No accommodations or modifications were offered throughout his attempt to comply with the FPP.

46. DCS was on notice of Plaintiff Marble's seizure disorder alleged to be the basis for him not being able to care for H.S. by himself, and that his disability is supposedly such a risk such that it would imperil the child if he were to care for her alone.

47. In spite of the fact that there had never been a showing that Plaintiff Marble had ever harmed the child, DCS discriminated against Marble by insisting that Marble only have supervised visitation with H.S.

48. The September 5, 2013 CFTM meeting attendees went over the FPP which also stated, "Provider agency [Camelot Care] will work with Mr. Marble to ensure that he is able to visit with Hailey…[and] [t]he foster parent agrees to report any behaviors that the children [sic] might have before or after any visitation with their parents." (September 5, 2013 FPP signature pages, pg. 4).

    a. The "permanency goal" stated "return to parent" with a goal target date of January 8, 2014 (FPP, p. 2) The secondary permanency goal was listed as "exit custody with relative."

    b. The plan ordered Plaintiff Marble to pay child support, pay the State of Tennessee to offset medical expenses, maintain health insurance for the child, and provide documents for proof of income, including pay stubs (FPP, p. 3). This plan also states, "Mr. Marble has no bond or relationship with the child. Mr. Marble lives in another state. Mr. Marble's lack of residential stability. Mr. Marble has no

way to provide for himself or the child. Mr. Marble has a medical condition that poses a risk to solely care for the child." (FPP, pg. 4). DCS was to insure that each parent was able to visit four hours per month and they were to provide a third party to supervise the visits. Plaintiff Marble was placed under supervised visits even though he had never been accused of posing a risk of safety to the child. It was only in the discriminatory and conclusory language put in the plan language that indicted the Father as unfit. Still no individual assessment had been conducted. Plaintiff Marble was ordered to deliver to the case manager an affidavit listing all his prescribed medications and all of his medical providers. If he had any changes in his medications, he was to inform the case worker immediately. Plaintiff Marble was to obtain and A & D[7] assessment, stop the use of illegal drugs, alcohol, and non-prescribed medications, and submit and test clean to periodic random drug tests to verify sobriety (FPP, pg. 11). He was also to maintain sobriety for 6 months in an uncontrolled environment. Plaintiff Marble was to contact community resources for help in obtaining housing an household items; provide documentation to case manager; and provide proof of housing to DCS case manager in the form of rent receipts. Plaintiff Marble was also ordered to take a parenting class. He was ordered to get a clinical assessment and follow all recommendations and he had to "have stable mental health as deemed by qualified mental health professional."

_____

[7] Alcohol and Drug

S:\doc a-k\DuBoise, Bobbi  4-10062\Pleadings Federal\2015 Oct first amended complaint\160904 - first amended complaint as ordered .docx

c.  Given Plaintiff Marble's cognitive limitations, disabilities, financial status, impaired employability and his ongoing reliance on relatives for his housing, DCS's several requirements created a scenario that made it <u>impossible</u> for Plaintiff Marble to comply with their demands.  DCS's requirements were not reasonable, they were not related to the reason(s) the child was removed from Mother Aren Stuber in the first place, and DCS offered no accommodations or modifications commensurate with Plaintiff Marble's skill level that would enhance his access to various social services or that would facilitate his reunification with his daughter.

d.  Finally, the permanency plan stated that Plaintiff Marble would be "medically cleared from a qualified medical professional, in regards to his seizure disorder and how that affects / if any his ability to parent H.S. independently."  Court appointed GAL Virginia Thompkins was present at this meeting.  Court appointed attorney Jean Ann Hall was present at this meeting in behalf of the Mother.  Plaintiff Marble did not have counsel present at the meeting.  The plan document contains twenty-two (22) pages.  It is confusing and scattered and difficult for the most sophisticated to understand.  The plan document gives the Father no specific resources for the services demanded by DCS.  With the cognitive disabilities of the Plaintiff, he was unable to comprehend the full import of this document or even effectively challenge its contents.

49. DCS may not "utilize criteria or methods of administration…[t]hat have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the

S:\doc a-k\DuBoise, Bobbi  4-10062\Pleadings Federal\2015 Oct first amended complaint\160904 - first amended complaint as ordered .docx

public entity's program" when it comes to disabled parents. 28 C.F.R. Sec. 35.130(b)(3)(ii).

50. During the fall of 2013, Plaintiff Marble continued to believe, based on the communications he received from DCS caseworkers Lindsey Kenyon and Lois Gregory, the CFTM meetings from July 9, 2013 and September 5, 2013, and Attorney Underwood, that DCS intended to reunite the child with the child's mother, Aren Stuber, and that he would be able to set up visitation or otherwise provide care for his child after this matter had been resolved.

51. In the late fall of 2013, Plaintiff Marble's aunt, Bobbi DuBoise, contacted DCS caseworker Lindsey Kenyon and asked her what it would take for her (Bobbi DuBoise) be granted custody of H.S. Lindsey Kenyon told Ms. DuBoise repeatedly that she did not know what she would have to do to become an eligible custodian and told her she could be there to support her nephew (Plaintiff Marble). Lindsey Kenyon, as a DCS employee (and eventual case manager in this case) is imputed with knowledge of State law regarding the placement of children under the Interstate Compact for the Placement of Children. Lindsey Kenyon's direct interference with the commencement of this process was also intended to halt Plaintiff Marble's eventual ability to parent his child through the assistance of family. This is direct discrimination against Plaintiff Marble. Still, no individual assessment was provided for the Father. If the State agency would have complied with the requirements of the ADA, they would have determined that Plaintiff Marble had the ability to parent his child with the intervention and assistance of his aunt Bobbi DuBoise and her family. Instead, DCS remained on course to end his relationship

with his daughter and re-home H.S. by transferring parental right to the foster parents. All for profit. In addition to being unconstitutional, this conduct is heartless and cruel, with a conscience disregard for the affirmative duty required under law.

52. Bobbi DuBoise and her husband Will DuBoise, Jr., resided in Michigan at all time during the events described in this complaint. Bobbi DuBoise is the maternal aunt of Plaintiff Marble. She has three children of her own. Bobbi DuBoise soon began to complete the steps required to become H.S.'s foster parent in Michigan.

53. On November 7, 2013, a preliminary hearing was set (over four months after the "removal" of the child) and Plaintiff Marble's court appointed attorney Jamie Underwood convinced him that he should waive the preliminary hearing and leave his child in the custody and control of DCS even though the only allegations against him in the petition were false statements and NO ONE had alleged that the Father was a danger to his child.

    a. At this hearing, Bobbi DuBoise appeared in support of her nephew. After the Court proceedings, Dana Davis (Camelot Care foster mother) turned to GAL Virginia Thompkins and told her, "You promised me this baby." GAL Thompkins responded, "I know, and we are going to win."

54. In December 2013, Bobbi DuBoise contacted DCS employee Felicia Harris who instructed Bobbi DuBoise on how to proceed with the Interstate Compact for the Placement of Children ("ICPC") found at Tenn. Code Ann. § 37-4-201 *et seq* (Administrative Policies and Procedures 1.30). The ICPC is the legal mechanism for placing children with foster parents in another state. Mr. DuBoise and her husband started this process right away.

S:\doc a-k\DuBoise, Bobbi 4-10062\Pleadings Federal\2015 Oct first amended complaint\160904 - first amended complaint as ordered .docx

55. Over the course of the next several months, Plaintiff Marble did what he could to try to comply with the demands of DCS, however the terms were impossible. Plaintiff attempted to get an assessment in Michigan, but he was unable to pay for it. DCS told him he would have to come to Tennessee to get the assessment done if he wanted the State of Tennessee to pay. Therefore, he traveled to Tennessee to comply with their request. He complied with the requests for drug testing and with the request to submit to hair follicle drug testing, even though there were NO allegations that he had abused drugs or that he had injured the child.

56. On January 2, 2014, DCS held another CFTM meeting to discuss the participants' progress with the September 5, 2013 FPP. Among those in attendance were DCS worker Lindsey Kenyon, DCS supervisor Lois Gregory, Camelot Care employee Allison Kennedy, Camelot Care foster mother Dana Davis, Mother Aren Stuber, Plaintiff Marble, Bobbi DuBoise, and Attorney Underwood (Attorney Underwood participated by telephone). Foster mother Dana Davis had already made it clear at the November 7, 2013 hearing that she wanted to become the new parent to H.S. when she said to GAL Thompkins, "You promised me this baby!" By then, the foster parents' personal stake in rehoming H.S. was in direct conflict with Plaintiff Marble's interests, yet Dana Davis continued to participate in the January 2, 2014 CFTM alongside the father whom she hoped would be eliminated as a parent.

57. The CFTM summary from January 2, 2014 states that "Matt is having a hard time getting services in Michigan…Bobbi, the great Aunt to Hailey is going thru the process of being approved resource parents in Michigan, and would like Hailey if the parents can't get her

S:\doc a-k\DuBoise, Bobbi 4-10062\Pleadings Federal\2015 Oct first amended complaint\160904 - first amended complaint as ordered .docx

back, so this could be a plan B w[ith] the department." (January 2, 2014 CFTM Summary, pp. 1-2).   This documentation confirms that DCS implemented NO accommodation, modification or assistance with the September 5, 2013 plan.  Plaintiff Marble could not meet the arduous terms of the "plan" established by the State agency. Still no independent assessment had been completed on Plaintiff Marble.

58. In January 2014, Lindsey Kenyon wrote a letter to Plaintiff Marble telling him that if he wanted any services paid for, he had to live in the State of Tennessee.

59. Lindsey Kenyon wrote this letter despite the fact that DCS knew that a relative was willing to step in and care for the child so Plaintiff Marble could maintain his parent-child relationship.

60. On March 4, 2014, another CFTM meeting was held to discuss progress with the September 5, 2013 FPP.  By this time, Lindsey Kenyon was the DCS case manager in this matter.  Also in attendance on March 4, 2014 were Plaintiff Marble, Bobbi DuBoise, Camelot Care employee Allison Kennedy, Camelot Care foster mother Dana Davis, and Attorney Underwood.  Upon information and belief, DCS worker Lindsey Kenyon made notes at this meeting to "do a records request for [Plaintiff Marble's] seizure meds" (p. 17) and that Plaintiff Marble "does chores for rent" (p. 14).

61. In March 2014, Bobbi DuBoise became licensed as a foster placement by the State of Michigan.

62. By April 2014, the ICPC was approved by the State of Michigan and the documents were transferred to the State of Tennessee.  The State of Tennessee Department of Children's

S:\doc a-k\DuBoise, Bobbi  4-10062\Pleadings Federal\2015 Oct first amended complaint\160904 - first amended complaint as ordered .docx

Services approved the ICPC of Bobbi and Will Duboise, Jr. These documents were filed with the Juvenile Court of Macon County, Tennessee in April 2014.

63. It was clear the Plaintiff Marble would never be able to complete all of the terms of the permanency plan and he had been unable to maintain a job that would allow him to pay child support to the State of Tennessee. The other requirements of DCS were ambiguous and undefined. Plaintiff Marble was required to do a "relapse prevention plan" with no direction as to what this would require and NO proof that he had any current substance abuse issues. He was also required to do "therapy" and yet he was given no instructions on what it would take to satisfy DCS so that he would be eligible for custody of his child that he had never abused.

64. Only after the DCS file had been produced in the legal proceedings did Plaintiff discover that DCS caseworker Lindsey Kenyon had written a letter to interfere with the approval of the ICPC placement of the child.

65. It is apparent that the foster parents wished to take over the right to parent H.S. with the assistance of their counterpart, the Department of Children's Services.

66. On May 27, 2014, DCS completed a Quarterly Progress Report on Child in State Custody. As evidenced by the signature of case manager Lindsey Kenyon, the parents' monthly visitations with H.S. were going well and were rated as being of "good" quality. Also, Plaintiff Marble's cooperation and compliance with the FPP's action steps was "excellent" in one category (six (6) months of sobriety). Plaintiff Marble's progress was also listed as being "good" in several categories, including his cooperation with providing to the case manager a list of his medications and dosages, his statement of

S:\doc a-k\DuBoise, Bobbi  4-10062\Pleadings Federal\2015 Oct first amended complaint\160904 - first amended complaint as ordered .docx

responsibilities, providing proof of housing, having a positive relationship with the child, and paying child support (May 27, 2015 Quarterly Progress Report, pp. 2-6). DCS labeled Plaintiff Marble's progress as "marginal" with regard to his submitting to random drug tests and in "demonstrate[ing] correct use of prescribed medications and compl[iance] with random pill counts." It was never explained how or why this "requirement" was imposed upon Plaintiff Marble since it had absolutely nothing to do with H.S.'s removal from her mother's care. Furthermore, this irrelevant requirement was NOT modified for Plaintiff Marble since he was residing in Michigan, living with and relying on relatives, while DCS and its service providers were located in Tennessee. Progress with Aunt Bobbi DuBoise's ICPC is listed as "good" (May 27, 2015 Quarterly Progress Report, p. 5). The permanency plan goals at this time were to either return H.S. to a parent or for exit custody with a relative (May 27, 2015 Quarterly Progress Report, p. 1).

67. On June 25, 2014, a "special" CFTM meeting was called because Bobbi DuBoise was pursuing placement of H.S. with her in Michigan. DCS workers Lindsey Kenyon and Lois Gregory were in attendance, along with Plaintiff Marble, Bobbi DuBoise, GAL Virginia Tompkins, and Camelot Care foster parents, Dana Davis and Brandon Givens. The meeting summary acknowledges that Plaintiff Marble "has a lot of support in Michigan," the "ICPC in Michigan has been approved on the Duboise home," and "[t]he Duboise home is an approved foster home." (June 25, 2014 CFTM Summary, p. 2). "Matt may not be an option for exit custody."

S:\doc a-k\DuBoise, Bobbi  4-10062\Pleadings Federal\2015 Oct first amended complaint\160904 - first amended complaint as ordered .docx

a. H.S. has cerebral palsy and requires several doctors' visits each month. Bobbi DuBoise stated that her place of employment for the past four (4) years, Community Action, would let her take time off from work to take H.S. to the doctor.

b. "The Duboise family is willing to do whatever to cooperate…Bobbi reports that she has an Associate Degree in Early Childhood Education [and] has training with Special Needs."

c. Purported concerns with placing H.S. with Bobbi DuBoise included "Hailey's routine, structure disrupted…The concerns are the transition to Michigan."

d. At this meeting, in front of the other attendees, Camelot Care foster father Brandon Givens confronted Plaintiff Marble why he "went back to Michigan <u>away</u> from Hailey." Brandon Givens asked this 1) even though he knew that Plaintiff Marble wanted H.S. to go with him to Michigan from the very beginning; 2) and even though he knew that Plaintiff Marble had tried, and was continuing to try, to bring H.S. back to Michigan with him; and 3) while knowing that Plaintiff Marble was unable to live alone in Tennessee where he did not have assistance of extended family members (June 25, 2014 CFTM Summary, handwritten portion ("Needs or Concerns Discussed," p. 3)). Foster Father Brandon Davis had his own agenda (wanting H.S. to be re-homed with him and Dana Davis).

68. In August 2014, Bobbi DuBoise and her husband obtained the services of a Tennessee Attorney Zach Taylor. She had already seen resistance for her to be considered as a

S:\doc a-k\DuBoise, Bobbi  4-10062\Pleadings Federal\2015 Oct first amended complaint\160904 - first amended complaint as ordered .docx

placement resource for the child. Indeed, GAL Virginia Thompkins filed a response in Juvenile Court in opposition to the child being relocated and placed with Ms. DuBoise and her husband. DCS attorney Choate also filed a response in opposition to the Court's approval of the ICPC. In the response filed by DCS, they opposed the intervention of Bobbi and Will DuBoise, Jr. claiming that they did not have "standing" to intervene relying on a case that states that they would not have standing to intervene in a termination of parental rights case. DCS also stated that "the position of the aunt and uncle can be adequately presented through their nephew Matthew Marble should he so choose. Even better, Mr. Marble could simply work his own permanency plan so that there relative's legal action would be moot." Then DCS stated that if the Court were to allow them to intervene, the Court should have a hearing on the "comparative fitness" between the relative versus the foster parents in consideration of the best interest of the child. Tennessee law provides the in a dependency action, that the Court may place the child with any person after the adjudication of dependant and neglect. TENN. CODE ANN. § 37-1-130. However, Tennessee law also provides under TENN. CODE ANN. § 37-2-414 that a "Kinship Foster Care Program" is established which states "when a child has been removed from such child's home and is in the care, custody or guardianship of the department, the department shall attempt to place the child with a relative for kinship foster care." The relative is allowed to receive payment for the full foster care rate for the care of the child and any other benefits that might be available to foster parents. Administrative Policies and Procedures 16.59 for DCS states that in accordance with DCS Policy 16.46, placement with a relative who can provide safety, permanence and

ensure well being for a child shall be preferred over that of a non-relative. The policy states that the authority for this provision comes under TENN. CODE ANN. § 37-5-106; 37-1-801; 37-1-802; the Adam Walsh Child Protection and Safety Act of 2006; Fostering Connections to Success and Increasing Adoptions Act of 2008; and the Indian Child Welfare Act of 1978 (ICWA).

69. Bobbi DuBoise also sought out medical professionals in Michigan who would be able to provide competent services for the child's medical and physical therapy needs. She presented them to DCS in a letter giving their names and contact information. DCS never sought to verify that these service providers would or would not be able to attend to the child's needs. In the dependant and neglect hearing, the child's physical therapist testified that the child has mild cerebral palsy which is a manifestation of a brain problem. Dr. Cruz testified in a deposition that the cerebral palsy was the result of the head injury and would not likely worsen.

70. On September 18, 2014, DCS filed a petition to terminate the parental rights of Plaintiff Marble in the Juvenile Court of Macon County before any adjudication had been entered on the petition for dependency and neglect (for the termination of parental rights matter, Plaintiff Marble was appointed Attorney Kara Everett in January 2015).

   a. The petition to terminate the parental rights of Plaintiff Marble stated that he had willfully failed to pay child support[8]; that he had failed to comply with the terms

---

[8] TENN. CODE ANN. § 36-1-113(g)(1) and 36-1-102(1)(A)(i)

S:\doc a-k\DuBoise, Bobbi  4-10062\Pleadings Federal\2015 Oct first amended complaint\160904 - first amended complaint as ordered .docx

of the permanency plan established by DCS[9]; and that the conditions which led to the removal from his home continue to exist[10]  Those factors were set forth as the grounds for the termination of his parental rights.

b.   The petition to terminate Plaintiff Marble's parental rights alleged that conditions which led to the removal from his home continued to exist.  DCS made this allegation despite the fact that both the July 9, 2013 DCS FPP and September 5, 2013 DCS FPP state that the "specific event" that led to the child being taken into state custody had **only** to do with injuries inflicted upon H.S. while in the care of Mother Aren Stuber, Mother's friends and Mother's family.  (July 9, 2013 FPP, p. 4; September 5, 2013 FPP, p. 3).  Plaintiff Marble was in Michigan at the time of the child's injury and was not implicated in the "specific event" leading to the "removal" from the home.

c.   In addition, the petition to terminate Plaintiff Marble's parental rights stated that because the Father was unable to provide for the child because he had not provided for a safe environment for the child; that a meaningful relationship had not been established with his child; that a change in caretaker is likely to have a negative effect on the child; and that the father's "mental and/or emotional status" would be detrimental to the child. The petition stated it was in H.S.'s best interest for his rights to be terminated.

---

[9] TENN. CODE ANN. § 36-1-113(g)(2)
[10] TENN. CODE ANN. § 36-1-113(g)(3)

S:\doc a-k\DuBoise, Bobbi  4-10062\Pleadings Federal\2015 Oct first amended complaint\160904 - first amended complaint as ordered .docx

d. DCS's petition alleged that Plaintiff Marble had not established a meaningful relationship with the child. Even if this were true, the undermining of his parental rights and repeatedly thwarting his access to his own child by unconstitutional and discriminatory means by DCS and caused the *very damage* to the father-daughter relationship that DCS alleged existed.

e. DCS's petition alleged that a change in caregiver would likely have a negative effect on the child. Again, if DCS had not interfered with Plaintiff Marble's parental rights to begin with, there would be no "change in caregiver."

f. The petition's conclusory and discriminatory remarks demonstrate that DCS assumed that the father was unable to learn how to safely care for his daughter because of his disability. This is a violation of the ADA and Section 504. By this point, there was *still* no independent assessment performed on Plaintiff Marble.

g. By this time, Plaintiff Marble continued to be denied the opportunity to receive meaningful assistance from relatives and other service providers is a violation of the ADA and Section 504.

h. The State sought to terminate the father's parental rights on the basis of his disability. This is a violation of the ADA and Section 504.

i. On the first appearance for the termination proceeding, Attorney Everett asked the Court to delay the termination proceeding until Plaintiff Marble had been able to have his de novo hearing in Circuit Court where new counsel intended address the State's failure to provide the Father with an independent assessment related to his

S:\doc a-k\DuBoise, Bobbi  4-10062\Pleadings Federal\2015 Oct first amended complaint\160904 - first amended complaint as ordered .docx

ability to parent in light of his disability. Juvenile Court Judge Witcher denied that request.

71. Sometime in September 2014 while both the dependency and neglect and termination of parental rights petitions were pending, Camelot Care foster father Brandon Givens supervised a visitation that took place between Plaintiff Marble and his daughter.[11] Brandon Givens documented the actions of the father nearly every ten minutes, criticizing Plaintiff Marble's care of the child. Brandon Givens complained that Plaintiff Marble was clumsy changing her diaper, that he did not have enough juice for her, and that she got hot outside and Plaintiff Marble did not want to take her inside.

72. DCS had a duty to provide a individual assessment of Plaintiff Marble and accommodated him for his disabilities.

73. Because of the importance of family relationships, the General Assembly has recognized that children should not be separated from their parents unless separation is necessary for the children's welfare or in the interest of public safety. *See* Tenn. Code Ann. §§ 37-1-101(a)(3), 37-2-401(a) (2001).

74. Tenn. Code Ann. § 37-1-166 directs that DCS make reasonable efforts to "preserve, repair, or restore" parent-child relationships.

75. Tenn. Code Ann. § 36-1-113(c) directs that DCS must make reasonable efforts to reunite the child with her Father. (citing Tenn. Code Ann. § 36-1-113(c). Instead of making

_____

[11] Foster father received money for the care of the child, free medical insurance, and free day care for the child.

S:\doc a-k\DuBoise, Bobbi  4-10062\Pleadings Federal\2015 Oct first amended complaint\160904 - first amended complaint as ordered .docx

reasonable efforts to reunite H.S. with Plaintiff Marble, DCS imposed unrealistic obstacles and cruelly interfered with Plaintiff Marble's aunt obtaining custody.

76. On September 29, 2014, another CFTM meeting was held with DCS, Plaintiff Marble, Bobbi and Will DuBoise, and the foster parents Dana Davis and Brandon Givens to discuss a *new* FPP. The September 29, 2014 CFTM summary states, "This is the third [family permanency] plan for this family. The former goals were return to parents or exist [sic] custody to relatives. <u>With the termination petition [for termination of father's parental rights] being filed, we will be placing adoption on the goal.</u> <u>The goal for exist [sic] custody to the relatives has been taken off</u>." (September 29, 2014 FPP, p. 1) (emphasis added).

77. DCS did not wait for the termination of parental rights proceeding to conclude before taking exit custody "off the table," but rather soon after the petition was filed sought to adopt H.S. out to her foster parents. DCS did this despite the fact that "Mr. Matthew Marble has never failed any drugs [sic] and continues to do well [sic] no drug activity for the last 6 months…Matthew has family support. Matthew has been released from the [doctor] and has obtained a drivers [sic] permit." (September 29, 2014 FPP, p. 3).

78. A hearing was held September 29, 2014, in the Macon County Juvenile Court. Juvenile Court Judge Witcher denied the ICPC and prohibited the child from leaving the State of Tennessee without adjudicating that any harm would come to the child in the care of the Father or the relatives in Michigan. He denied placement of the child with Bobbi DuBoise despite the fact that Bobbi DuBoise indicated that it was her intent to insure that Plaintiff Marble maintained his relationship with his daughter and that he would have

continued family support while he continued to try to complete his education and maintain employment.

79. On September 29, 2014, the case was set before Judge Witcher on the Amended Petition for dependency and neglect and Plaintiff Marble appeared in Court with his Attorney Underwood.   Attorney Underwood advised Plaintiff Marble that he could not win the petition and therefore, he should stipulate to an adjudication of dependency and neglect. Plaintiff Marble did not understand the nature of what was to occur and did not know how to respond.   Attorney Underwood was ineffective in her assistance as counsel and did not protect the constitutional rights of Plaintiff Marble.    In fact, the "stipulation" stated that he was not the legal father, which was false.  Put simply, Attorney Underwood had Plaintiff Marble stipulate to false statements.[12]   DCS <u>knew</u> these stipulations were false and allowed this false stipulation to be put before the Court.

80. By now, the Plaintiff had traveled from Michigan to Tennessee every month from September 2013 to September 2014 to visit with is daughter.   The child knows the Plaintiff is "daddy."   Their visits were intrusively supervised and were limited to four hours per month.  At no time were there any complaints or allegations that the child was in danger while in his care.  Bobbi DuBoise had traveled with him and also visited with the child.

81. A day following the hearing adjudicating H.S. as dependent and neglected and denying ICPC placement with the DuBoises, on September 30, 2014, Plaintiff Marble and Bobbi

_____

[12] Attorney Underwood is the defendant in a pending legal malpractice case in Macon County Circuit Court (Case No. 2015-CV-83).

DuBoise identified Attorney Connie Reguli in Tennessee. Attorney Reguli immediately filed a Notice of Appeal. Under TENN. CODE ANN. § 37-1-159, Plaintiff Marble is entitled to a de novo hearing in the Circuit Court on an adjudication of dependency and neglect. Under statutory authority, this hearing is to occur within forty-five (45) days when the matter involved the removal of a child from the care of her parents. Since then, DCS has continued to stonewall Plaintiff Marble's efforts to have a de novo hearing even though nearly a year has passed.

82. The Order from the September 29, 2014 adjudication states that the child is dependent and neglected as to the Father, Plaintiff Marble, because he was not the legal father at the time of the filing of the petition and because he did not have stable housing at the time of the hearing (which he did).

83. The de novo hearing on the dependency and neglect was set in Circuit Court for January 2015. DCS attorney asked for a continuance which was granted by the Court. The case was set for March 2015, however inclement weather required resetting the matter again. The hearing commenced on April 21, 2015 but did not conclude and was thereafter "stonewalled" due to the DCS-instigated end-run triggered by their filing of the September 18, 2014 petition to terminate Plaintiff Marble's parental rights.

84. The de novo hearing on the dependency and neglect petition was still pending in the Circuit Court. If DCS were unable to sustain a finding of dependency and neglect against the Father, the Circuit Court would have been required to dismiss the petition as it relates to the Plaintiff Marble and the Court would be without jurisdiction to render any findings as to the Father's ability to parent or whether or not DCS ever had authority over the

S:\doc a-k\DuBoise, Bobbi  4-10062\Pleadings Federal\2015 Oct first amended complaint\160904 - first amended complaint as ordered .docx

Father to subject him to the rigorous permanency plan.  In addition to the de novo hearing on the adjudication, Bobbi DuBoise and Will DuBoise, Jr. had intervened for the purposes of determining placement of the child.  Further, T.C.A. § 37-1-130 would allow the Court to grant custody to Bobbi DuBoise even if it refused to turn the child over to Plaintiff Marble.  Just because the original petition had been brought by DCS, there is NO requirement under law that the Court place custody with DCS on a finding of dependent and neglect.

85. On April 21, 2015, the de novo hearing on the petition for dependency and neglect began. Attorney Reguli moved to dismiss the amended petition in that DCS had been provided sufficient information to show that Plaintiff Marble WAS the legal father of the child when the petition was filed and DCS had already notified Attorney Reguli that DCS did not intend to proceed on the "failure to protect" allegation against him.  The Court denied the motion when DCS stated that it intended to prove by clear and convincing evidence that Plaintiff Marble was not capable of parenting the child.

86. At the commencement of the hearing, GAL Lisa Cothran attempted to disqualify Attorney Reguli as counsel in that she had made an appearance in behalf of both Plaintiff Marble and his aunt and uncle.  Judge Clara Byrd, with permission of counsel, asked Plaintiff Marble to state on record if he felt like there was a conflict between his interests in the case and the interest of his aunt and uncle.  Plaintiff Marble stated that he knew that he could not care for the child alone and that even if he were given custody it was his intent for his aunt to care for the child.  Upon making that statement, DCS attorney Stacye Choate then asked the court to make a finding of dependency and neglect based

S:\doc a-k\DuBoise, Bobbi  4-10062\Pleadings Federal\2015 Oct first amended complaint\160904 - first amended complaint as ordered .docx

on his "admission" that he was unable to care for the child. The Court did not disqualify counsel and did not make a finding based on the statements of Plaintiff Marble. However, the Court allowed the hearing to proceed.

87. At the hearing, the first exhibit tendered by DCS over the objection of counsel was the Juvenile Court stipulated adjudication in which H.S. was found dependent and neglected as to Plaintiff Marble based on false facts that he was not the legal father and did not have stable housing. This Circuit Court proceeding is, by law, a *de novo* hearing which means it as if the first hearing did not occur.[13] The judge allowed the stipulation into the record over the objection of Plaintiff's counsel.

88. In a dependent and neglect hearing, the Court is required to make an adjudication of dependent and neglect by clear and convincing evidence <u>before</u> it can proceed to making a disposition on who would receive custody of the child.

89. At this hearing, DCS called witnesses only related to the disposition. They presented no proof that would support a finding of dependent and neglect against the Father. Father's counsel objected to the calling of these witnesses in that they were all "dispositional" witnesses and not "adjudication" witnesses. The Court overruled the objection and allowed DCS to proceed with their own order of proof.

_____

[13] *Green v. Green,* No. M2007-01263-COA-R3-CV, 2009 Tenn. App.LEXIS 69 at 2-3 (Tenn. Ct. App. Feb. 11, 2009) (Following the juvenile court's finding of dependency and neglect against the mother when she married a registered sex offender. The de novo hearing to circuit court allowed a "do over" wherein mother was permitted to show that she had divorced her husband and had worked to remedy the circumstances that led to the dependency and neglect adjudication in the juvenile court. The de novo hearing means that findings of the juvenile court are NOT res judicata. Put simply, it is as if the first hearing never occurred.

S:\doc a-k\DuBoise, Bobbi 4-10062\Pleadings Federal\2015 Oct first amended complaint\160904 - first amended complaint as ordered .docx

90. Camelot Care foster father Brandon Givens testified that he had supervised one visitation between Plaintiff Marble and the child. Brandon Givens documented the actions of the father nearly every ten minutes complaining about his care of the child. His discriminatory remarks that Plaintiff Marble was clumsy changing her diaper, that he did not have enough juice for her, and that she got hot outside and Plaintiff Marble did not want to take her inside were intended to promote his own private interest to take over the parenting of this child. This visitation occurred in September 2014. The Camelot Care foster father also admitted that he received money for the care of the child, however, he stated he was unsure of how much money. He also admitted that they received free medical insurance and free day care for the child.

91. At the close of the day on April 30, 2015, the de novo hearing had not concluded. It was reset for May 5 and May 12, 2015 with Circuit Court Judge Clara Byrd.

92. On April 30, 2015, the termination of parental rights action reconvened with Judge Witcher in Juvenile Court.

    a. The Juvenile Court of Macon County appointed Attorney Kara Everett to represent Plaintiff Marble on the September 18, 2014 petition to terminate his parental rights.

    b. The petition to terminate his parental rights stated that Plaintiff Marble had willfully failed to pay child support, that he had failed to comply with the terms of the permanency plan, and that the father's "mental and/or emotional status" would be detrimental to the child.

S:\doc a-k\DuBoise, Bobbi 4-10062\Pleadings Federal\2015 Oct first amended complaint\160904 - first amended complaint as ordered .docx

c.  On the first appearance for the termination proceeding, Attorney Everett asked the Court to delay the termination proceeding until Plaintiff Marble had been able to have his de novo hearing in Circuit Court.  Judge Witcher denied that request and set the hearing to commence on March 13, 2015.  At the close of the day, the matter had not concluded and it was continued to April 30, 2015.

d.  The Juvenile Court Judge found grounds for termination of the parental rights of Plaintiff Marble on the grounds that he had failed to pay child support to the State of Tennessee and he had failed to comply with the requirements of DCS's FPP.

93. On May 5, 2015, DCS filed in Circuit Court a motion to dismiss Plaintiff Marble's de novo appeal on the adjudication of the dependency and neglect, arguing that the dependency and neglect issue was now "moot" since his parental rights had been terminated on April 30, 2015.[14,15]

94. On May 5, 2015, Plaintiff Marble filed a federal action against DCS, Camelot Care, the foster parents, and other state actors under Title II of the ADA and Section 504, alleging that the defendants individually and collectively violated his constitutional right to parent,

_____

[14] Plaintiff Marble is appealing the termination of his parental rights in the Court of Appeals (Case No. M2015-842-COA-R3-PT).

[15] In *DCS v. Owens et al*, 129 S.W.3d 50 (Tenn. 2004), DCS took a similar procedural path and terminated the rights of a parent while a de novo appeal was pending in the Circuit Court.  The Supreme Court stated that this caused the appellants to be "vernacularly stated, cut off at the pass [and that] [t]his procedure, whether accomplished inadvertently or intentionally, effectively ensnared the [appellants] in a jurisdictional trap.  Despite their timely and proper efforts, they were denied the opportunity to present their custody case and receive a ruling on the merits."  The Supreme Court held that the appellants were denied their hearing and that the clear policy of this state favors the adjudication of disputes on their merits.

S:\doc a-k\DuBoise, Bobbi  4-10062\Pleadings Federal\2015 Oct first amended complaint\160904 - first amended complaint as ordered .docx

and that these same state actors acted with reckless disregard for his limitations and disabilities.

95. Also on May 5, 2015 was the continuation of the April 21, 2015 hearing on the dependency and neglect in Circuit Court. The Circuit Court continued the matter to June 15, 2015 so that DCS might have the opportunity to confer with counsel regarding the federal lawsuit. On June 15, 2015, the case was continued yet again to July 17, 2015, and again continued for a status conference set for August 24, 2015. On August 24, 2015, the Circuit Court stayed the proceedings on the de novo appeal.[16]  Plaintiff Marble is appealing the order staying the proceedings.

96. On August 19, 2015, Plaintiff Marble filed in Circuit Court the August 10, 2015 Announcment of the U.S. Department of Justice Technical Assistance for Child Welfare Systems Under the ADA and Section 504 on the requirements for child welfare agencies to comply with ADA and Section 504 and to ensure compliance with nondiscrimination.

97. On this same date, Plaintiff Marble filed in Circuit Court the August 10, 2015 Joint Letter regarding Child Welfare Agencies' Responsibilities detailing the objectives of the U.S. Department of Health and Human Services Children's Bureau and the U.S. Justice Department as to the obligations for child welfare agencies to ensure that parents with disabilities have equal access to parenting opportunities without artificial barriers posed by discrimination.

---

[16] Plaintiff Mable and Intervenors Bobbi and Will DuBoise have filed an application for Extraordinary Appeal under Rule 10 for relief from the stay.

S:\doc a-k\DuBoise, Bobbi  4-10062\Pleadings Federal\2015 Oct first amended complaint\160904 - first amended complaint as ordered .docx

98. Despite these filings which outline the duties of DCS and Camelot Care in ADA cases, on August 24, 2015 DCS stonewalled Plaintiff Marble in Circuit Court, arguing that his de novo appeal was stayed.

99. Plaintiff Marble is making all attempts to "undo" the harm in his case and to have his de novo appeal fully adjudicated in the Circuit Court as required. Plaintiff Marble has pursued his remedies vigorously but has been thwarted by DCS's false statements in their petitions, DCS's interference with his aunt's ICPC placement, DCS's refusal to accommodate him for his disabilities, and DCS's continued efforts to deny him his de novo appeal in Circuit Court.

### IN THE CASE OF SARA GORDON - MASSACHUETTS

100.        In January 2015, the United States Department of Justice, Civil Rights Division, and the Office for Civil Rights, U.S. Department of Health and Human Services, completed their investigation in the State of Massachusetts in the case of Sara Gordon.[17] In this report, they found that State child welfare agency had violated the rights of this young mother with development disabilities under the authority of ADA and Section 504. The case before this Court is substantially similar. In the Case of Sara Gordon, the investigation revealed that the agency had:

---

[17] A copy of said case has previously been filed with this court. It is offered as instructive only.

S:\doc a-k\DuBoise, Bobbi  4-10062\Pleadings Federal\2015 Oct first amended complaint\160904 - first amended complaint as ordered .docx

a. Acted based on the agency's discriminatory assumptions and stereotypes about her disability, without consideration of implementing appropriate family-based support services (pg 2);

b. Continued to deny the mother access to appropriate family-based support services it makes available to other parents to successfully achieve reunification;

c. Failed to reasonably modify its policies, practices, and procedures to accommodate the mother's disability;

d. Assumed that the mother was unable to learn how to safely care for her daughter because of her disability, and therefore denied her the opportunity to receive meaningful assistance from her mother and other service providers; and

e. Changed the permanency goal to adoption and sought to terminate the mother's parental rights on the basis of her disability.

101. In the Sara Gordon investigation, several professionals reviewed the case and found that a family-supported parenting plan with the grandparents having guardianship and making all major decisions for the child, along with a plan for the mother to continue her relationship with her daughter would be appropriate.

102. The agency was instructed to withdraw the termination proceedings against the Mother; take all necessary steps to give the Mother a full and equal opportunity to seek reunification; pay compensatory damages to the Mother in an appropriate amount for her injuries suffered as a result of the agency's failure to comply with the law; and develop and implement procedures addressing how ADA and Section 504 requirements apply to

S:\doc a-k\DuBoise, Bobbi  4-10062\Pleadings Federal\2015 Oct first amended complaint\160904 - first amended complaint as ordered .docx

the agency programs, services, and activities, including assessments, service planning and implementation, visitation, and safety requirements.

103.    As similarly found in the case of Ms. Gordon, in Plaintiff Marble's case, but for the failures of DCS to perform an individual assessment and to provide reasonable accommodations, his parental rights would not have been terminated.

104.    Plaintiff Marble is entitled to the same or greater relief demanded by the Department of Justice for Ms. Gordon.

## LEGAL BASIS FOR CLAIM AGAINST THE DEFENDANTS[18,19]

Congress enacted the ADA nearly 25 years ago "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1). Congress found that "the Nation's proper goals regarding individuals with disabilities are to assure equality of opportunity, full participation, [and] independent living" and that "the continuing existence of unfair and unnecessary discrimination and prejudice denies people with disabilities the opportunity to . . . pursue those opportunities for which our free society is justifiably famous." 42 U.S.C. § 12101(a)(7), (8). Title II prohibits discrimination by public entities on the basis of disability. *To wit::*

---

[18] As described in the case of Sara Gordon – letter from the Department of Justice. January 2015.
[19] As also described in Protecting the Rights of Parents and Prospective Parents with Disabilities by the United States Department of Health And Human Services, Office for Civil Rights Administration for Children and Families, and the United States Department of Justice, Civil Rights Division, Disability Rights Section.
http://www.ada.gov/doj_hhs_ta/child_welfare_ta.html

> [N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity. 42 U.S.C. § 12132.

Congress enacted the ADA to broaden the coverage of the Rehabilitation Act of 1973, which similarly prohibits discrimination against individuals with disabilities by recipients of federal financial assistance. 29 U.S.C. § 794. Section 504 similarly provides:

> No otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . .29 U.S.C. § 794(a).

**a) Title II and Section 504 of the Rehabilitation Act:**

Title II covers essentially everything state and local governments and their agencies do. *See Pa. Dept. of Corrs. v. Yeskey*, 524 U.S. 206, 209-12 (1998) (discussing the breadth of Title II's coverage). Section 504 also applies to all of the activities of agencies that are federally funded and, as a general rule, violations of Section 504 also constitute violations of Title II.[20] As such, Title II and Section 504 apply to everything DCS does, including its investigations, assessments, removals, family preservation, provision of services, determining goals and

---

[20] A "program or activity" is defined under Section 504 to include "all of the operations of a department, agency, . . . or other instrumentality of a State or of a local government" and "the entity of such State or local government that distributes such assistance and each such department or agency (and each other State or local government entity) to which the assistance is extended, in the case of assistance to a State or local government." 29 U.S.C. § 794(b)(1)(A), (B). As such, all operations of a state government agency are covered by Section 504 if any part of it receives federal financial assistance. Title IV-B and Title IV-E of the Social Security Act are the primary sources of federal child welfare funding, and DCF accepts such funding.

S:\doc a-k\DuBoise, Bobbi  4-10062\Pleadings Federal\2015 Oct first amended complaint\160904 - first amended complaint as ordered .docx

permanency plans, setting service plan tasks, reunification, guardianship, adoption, and assisting

clients in meeting such tasks.[21]  Furthermore, DCS is responsible for ensuring that agencies with

which they contract also comply with Title II and Section 504, even though the contractor is a

private entity.  See 42 U.S.C. Sec. 12181-12189 ("to the extent that courts and agencies contract

with private agencies and providers to conduct child welfare activities, the agencies should

ensure that in the performance of their contractual duties contractors comply with the prohibition

of discrimination in Title II and Section 504."[22]Pursuant to congressional directive, *see, e.g.*, 42

U.S.C. § 12134; 28 C.F.R. § 41.4, the Departments of Justice and Health and Human Services

have promulgated regulations implementing Title II and Section 504.  *See* 28 C.F.R. pt. 35 (Title

II); 45 C.F.R. pt. 84 (HHS Section 504); 28 C.F.R. pt. 42, subpt. G (DOJ Section 504).  Both

agencies are responsible for investigating complaints and conducting compliance reviews under

Title II.  *See* 28 C.F.R. pt. 35, subpt. F, G.  Because DCS receives financial assistance from the

---

[21] During the Justice Departments' investigation in Sarah Gordon, DCF suggested, based on *Adoption of Gregory*, 434 Mass. 117, 121 (2001), that the ADA may not be raised as a defense to proceedings to terminate parental rights because such proceedings do not constitute a "service" under the ADA.  The Justice Department has long taken the position in its regulatory guidance, technical assistance, and enforcement actions that Title II applies to everything a public entity does—all of the child welfare services it provides, including recommendations and petitions related to child welfare matters and proceedings to terminate parental rights.  The legal conclusion that termination proceedings are not covered by the ADA similarly cannot be squared with the U.S. Supreme Court's unanimous pronouncement in *Yeskey*, 524 U.S. at 209-12 (finding, beyond question, that a non-voluntary motivational boot camp in state prison was covered for participation by inmates with disabilities).

[22] Protecting the Rights of Parents and Prospective Parents with Disabilities by the United States Department of Health  And Human Services, Office for Civil Rights Administration for Children and Families, and the United States Department of Justice, Civil Rights Division, Disability Rights Section. See Footnote 66.
http://www.ada.gov/doj_hhs_ta/child_welfare_ta.html#_ftnref66

S:\doc a-k\DuBoise, Bobbi  4-10062\Pleadings Federal\2015 Oct first amended complaint\160904 - first amended complaint as ordered .docx

U.S. Department of Health and Human Services, it has jurisdiction under Section 504. 45 C.F.R. § 84.61.

Under these regulations, covered entities may not directly, contractually, or through other arrangements "deny a qualified individual with a disability the opportunity to participate in or benefit from [an] aid, benefit, or service." 28 C.F.R. § 35.130(b)(1)(i); *see also* 45 C.F.R. § 84.4(b)(1)(i). Covered entities must provide aid, benefit, and service that is equal to that afforded to others.28 C.F.R. § 35.130(b)(1)(ii); *see also* 45 C.F.R. § 84.4(b)(1)(ii).

Covered entities may not "utilize criteria or methods of administration (i)[t]hat have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability or (ii) [t]hat have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities." 28 C.F.R. § 35.130(b)(3)(i), (ii); *see also* 45 C.F.R. § 84.4(b)(4)(i), (ii). In the case of Plaintiff Marble, DCS used their criteria for "good parenting skills" to administer numerous and irrelevant obligations which ultimately defeated and impaired the accomplishment of the objectives of the public entity's program. According to DCS's own words, "exit custody" with a parent was the "desired outcome." If that did not work, DCS's own CFTM summary from January 2, 2014 states state that "Bobbi, the great Aunt to Hailey is going thru the process of being approved resource parents in Michigan, and would like Hailey if the parents can't get her back, so this could be a plan B w[ith] the department." (January 2, 2014 CFTM Summary, pp. 1-2).

The preamble to the 1991 Title II regulation explains that the criteria and methods of administration are the policies and practices of the public entity. 28 C.F.R. pt. 35, App. B

(discussing 28 C.F.R. § 35.130(b)(3)). A public entity may impose legitimate safety requirements necessary for the safe operation of its services, programs, or activities only if those safety requirements are based on actual risks, not on mere speculation, stereotypes, or generalizations about individuals with disabilities. 28 C.F.R. § 35.130(h).

In addition to these prohibitions, covered entities must take certain steps to avoid discrimination on the basis of disability. In particular, covered entities are required to "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity being offered." 28 C.F.R. § 35.130(b)(7); *see also* 45 C.F.R. § 84.4(a); U.S. Dep't of Justice, Title II Technical Assistance Manual § II-6.1000, Illustration 2 (1993) (explaining that public entities may need to make modifications to programs such as individualized assistance to permit individuals with disabilities to benefit).

To make a claim under Section 504, a plaintiff need only show he was handicapped, he was qualified for the service sought, he was discriminated against, and the program receives federal funds. *Grzan v. Charter Hosp. of Northwest Indiana,* 104 F. 3d. 116, 119 (7th Cir. 1997).

The ADA and Section 504 thus seek to ensure parents with disabilities are free from discrimination in the provision of services, programs, and activities of child welfare agencies. This includes a prohibition on making child custody decisions on the basis of generalized assumptions about disability, relegating parents with disabilities to lesser services and opportunities, imposing overprotective or unnecessarily restrictive rules, and failing to reasonably modify policies, practices, and procedures. 42 U.S.C. § 12101(a)(5).

S:\doc a-k\DuBoise, Bobbi 4-10062\Pleadings Federal\2015 Oct first amended complaint\160904 - first amended complaint as ordered .docx

## CAUSE OF ACTION

105.     The defendant State of Tennessee and Department of Children's Services has violated the provisions of Title II of the Americans with Disabilities Act (ADA), 42 U.S.C. § § 12131 – 12134.

106.     The Department of Children's Services receives funds from the United States Federal government under the Social Security Act, Title IV – E and Title IV – B.   The defendants named herein receive a financial benefit directly and accomplish their own personal objections through the proliferation of the federal funding scheme that financially incentives the removal of children; or are in a supervisory or delegatory position over the child welfare system.

107.     The defendant Department of Children's Services had an affirmative duty to provide an individual assessment of Plaintiff Marble's abilities and limitations to parent his daughter as a result of his disability.   The failure to do so is ipso facto in violation of ADA and Section 504.

108.     The defendant Department of Children's Services acted with reckless disregard for the rights of the Plaintiff and in fact, knowingly, willfully, and intentionally established such unattainable criteria for the Plaintiff that they manufactured the demise of his relationship with his daughter.   Some of the most glaring instances include requiring Plaintiff Marble to get a full time job, to establish an independent living situation, and to submit to numerous irrelevant and vague requirements.

109.     Defendant Department of Children's Services had no personal jurisdiction over the Plaintiff to require his participation in the permanency plan in the first place.   There

S:\doc a-k\DuBoise, Bobbi  4-10062\Pleadings Federal\2015 Oct first amended complaint\160904 - first amended complaint as ordered .docx

were no allegations of abuse or neglect against him. DCS should have transferred custody to the Father when he entered the State of Tennessee to pick her up. Defendant DCS had no authority over Plaintiff Marble and made an invasion into his privacy rights by requiring him to take drug tests; requiring him to turn over all of his medical provider information; and keep DCS informed of his medications. Defendant DCS ignored state law and agency policies in not making a relative placement if for any reason they could have obtained jurisdiction over the Plaintiff. Mostly important to this action, is that DCS failed to provide adequate provisions for the disabilities of the Plaintiff in contrary to the requirements of the law, acted in such a manner that they assured Plaintiff Marble's dismal failure. DCS manufactured the conditions that created the grounds for termination of his parental rights. DCS caused Plaintiff Marble to make several costly trips to Tennessee in the hopes that he may be reunited with his daughter.

110.     Plaintiff Marble has suffered economic damages.

111.     Plaintiff Marble has suffered trauma and emotional damages as a direct and proximate result of the acts of the Defendants.

112.     The Defendant Department of Children's Services acted with intentional discrimination and reckless indifference to Plaintiff Marble's disabilities.

113.     Plaintiff Marble has suffered the irreparable damage to his relationship with is daughter.

114.     Plaintiff Marble's anguish shall continue until he is reunited with his daughter again.

S:\doc a-k\DuBoise, Bobbi  4-10062\Pleadings Federal\2015 Oct first amended complaint\160904 - first amended complaint as ordered .docx

PREMISES CONSIDERED, the Plaintiff prays of this Court.

1. Plaintiff Marble prays for a jury of twelve (12) to hear his cause.

2. Plaintiff Marble prays for damages, compensatory, and emotional, against the Defendants. Said damages are not to exceed ten (10) million dollars.

3. Plaintiff Marble prays for punitive and exemplary damages against the Defendants.

4. That in the event it becomes necessary to seek extraordinary relief to enjoin the Defendants, that this Court considered such relief upon proper filing.

5. Plaintiff Father prays for such other relief as may be deemed appropriate by the Court.

This is the 5 day of SEPTEMBER 2016.

Respectfully submitted,

/s/Connie Reguli
Connie Reguli
BPR #16867
Attorney for Plaintiff
**LawCare- Family Law Center, P.C.**
1646 Westgate Circle, Ste 101
Brentwood, TN 37027
615-661-0122
615-661-0197 FAX

S:\doc a-k\DuBoise, Bobbi  4-10062\Pleadings Federal\2015 Oct first amended complaint\160904 - first amended complaint as ordered .docx

## CERTIFICATE OF SERVICE

I, Connie Reguli, do hereby certify that a true and exact copy of the foregoing document has served on counsel through CM/ECF of which all attorneys have provided service emails on this the 5 day of September 2016 to:

Mark E. Stamelos
Joshua J. Sudbury
*For Camelot Care, Dana Davis,*
*And Brandon Givens*
Ford Harrison LLP
150 Third Ave So.
Ste 2010
Nashville, TN 37201
615 574 6700
Fax 615 574 6701
mstamelos@fordharrison.com
jsudbury@fordharrison.com
dwilliams@fordharrison.com

Brian Pierce
Assistant Attorney General
General Civil Division
PO Box 20207
Nashville, TN 37202
615 532 7913
BPR 000229
brian.pierce@ag.tn.gov


/s/Connie Reguli
Connie Reguli

S:\doc a-k\DuBoise, Bobbi 4-10062\Pleadings Federal\2015 Oct first amended complaint\160904 - first amended complaint as ordered .docx