UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| MATTHEW MARBLE, | |
|      Plaintiff, | Case No. 3:15-cv-00508 |
| v. | Magistrate Judge Newbern |
| STATE OF TENNESSEE, et al., | |
|      Defendants. | |

## <u>MEMORANDUM OPINION</u>

Plaintiff Mathew Marble is the biological father of a minor child, H.S. The Tennessee courts terminated Marble's parental rights in 2015 on grounds that he had failed to pay child support and meet the requirements of a plan established by DCS for him to assume custody. (Doc. No. 99-1, PageID# 1031, ¶ 23; Doc. No. 101, PageID# 1159.) Marble challenged the termination of his parental rights in the Tennessee state courts unsuccessfully. He now brings this federal action to challenge the termination of his parental rights as having been in violation of Title II of the Americans with Disabilities Act, 42 U.S.C. §§ 12131–12134, and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794. (Doc. No. 88, PageID# 793.) The State of Tennessee and its Department of Children's Services (DCS), who are the remaining defendants to Marble's claims, have moved for summary judgment (Doc. No. 97). For the reasons that follow, Defendants' motion is GRANTED.

# I.     Background

## A.  Factual History and State Court Proceedings[1]

Plaintiff Matthew Marble alleges that Defendants State of Tennessee and Tennessee Department of Children Services (DCS) discriminated against him on the basis of his disabilities in the proceedings leading up to the termination of his parental rights to his daughter H.S. Marble suffers from Osgood-Schlatter disease, which causes knee pain; a seizure disorder that causes memory issues; blindness in his left eye; and a history of depression and trauma. (Doc. No. 98, PageID# 840; Doc. No. 99, PageID# 1011.) After H.S. was born in Tennessee in 2012, Marble, who was 18 years old at the time, returned to his home in Michigan. *In re H.S.*, No. M2015-00842-COA-R3-PT, 2016 WL 3209444, at *1 (Tenn. Ct. App. May 31, 2016) (*H.S. I*); (Doc. No. 101). H.S. lived with her minor mother and her maternal grandmother, who was H.S.'s legal custodian. *H.S. I.*, 2016 WL 3209444, at *1.

Marble came into contact with DCS after H.S. was seriously injured while in her mother's care. *Id.*; (Doc. No. 99, PageID# 1005). On June 23, 2013, H.S. was treated for head trauma and "a series of bruises on her face and torso," injuries that contributed to H.S.'s development of cerebral palsy. (Doc. No. 88, PageID# 755, ¶ 22; 774, ¶ 69). DCS became involved in H.S.'s care

---

[1]     The facts included in this opinion are drawn from Marble's amended complaint (Doc. No. 88), the parties' summary judgment filings (Doc. Nos. 98, 99, 100, 101 129, 130), and two Tennessee Court of Appeals decisions that provide helpful context for the claims in this action. *In re H.S.*, No. M2016-00387-COA-R3-JV, 2016 WL 7048840 (Tenn. Ct. App. Dec. 5, 2016) (*H.S. II*) (upholding the finding that H.S. was dependent and neglected); *In re H.S.*, No. M2015-00842-COA-R3-PT, 2016 WL 3209444 (Tenn. Ct. App. May 31, 2016) (*H.S. I*) (upholding the termination of Marble's parental rights). Defendants reference the Tennessee Court of Appeals decisions in their supplemental summary judgment briefing, arguing that certain factual findings have a preclusive effect in this lawsuit. (Doc. No. 130, PageID# 1392.) The Court's references to the state court opinions reflect only an effort to provide context and should not be construed as tacit acceptance of Defendants' argument that the Tennessee Court of Appeals' findings have a preclusive effect here.

after "receiving a referral indicating drug exposure and lack of supervision." *H.S. I*, 2016 WL 3209444, at *1. Because H.S.'s mother "admitted to extensive drug use," H.S. was taken into DCS custody and immediately placed with foster parents. *Id.*; (Doc. No. 88, PageID# 755, ¶ 22; Doc. No. 99, PageID# 1005.) Because H.S.'s mother listed H.S.'s father as "unknown" in documents that she provided to DCS, it was not until Marble learned of H.S.'s injuries from a relative that he became involved in the determination of H.S.'s placement. *H.S. I*, 2016 WL 3209444, at *1; (Doc. No. 88, PageID# 755, ¶ 23).

Consistent with Tennessee law, DCS developed a permanency plan for H.S. after placing her in foster care. Tenn. Code Ann. § 37-2-403(a)(1)(A); (Doc. No. 88, PageID# 758, ¶ 30). A permanency plan must establish a placement goal for a child in state custody and include "a statement of responsibilities between the parents, the agency and the caseworker of such agency." Tenn. Code Ann. § 37-2-403(a)(1)(A)–(2)(A). The plan relevant to this action was created on September 5, 2013, after a meeting at which Marble was present. (Doc. No. 88, PageID# 761–62, ¶¶ 41–43.) The plan's stated "permanency goals" for H.S. were to return to a parent's custody or, in the alternative, to be placed with a relative. (Doc. No. 98-3, PageID# 952.) To gain custody of H.S., the plan required Marble to:

> pay child support, to refrain from the use of illegal drugs, non-prescribed medications and/or alcohol, to use prescription drugs and over the counter drugs per the label instructions, to sign a release of information, to develop a relapse prevention plan to assist him in remaining sober, if prescribed narcotics[,] to obtain and deliver to the case manager an affidavit from the medical provider listing all medications and dosages, to obtain an alcohol and drug assessment and complete all treatment recommendations, to stop the use of illegal drugs, alcohol, and non-prescribed medications, to submit to and test clean on periodic, random drug tests to verify sobriety, to demonstrate correct use of random pill counts, to demonstrate sobriety for a minimum of 6 months in a non-controlled environment, to obtain and maintain housing for no less than 6 months, to contact community resources for help in obtaining housing and/or household items and provide documentation to case manager, to pay bills for food and housing utilities on time, to provide proof of housing to the case manager in the form of rent receipts, to have a legal income

to provide for [H.S.'s] needs, to notify [DCS] within 5 days of any change in employment, to establish a means of legal financial support through employment or public benefits, to provide proof of income to the case manager on a monthly basis, to develop and maintain a relationship with [H.S.] through visitation and demonstrate appropriate parenting and responsibility for the child, to take a parenting class to ensure that he has the tools to effectively parent [H.S.], to develop and maintain a positive relationship by visiting the child regularly, . . . to keep the case manager informed of his current living arrangements and circumstances, to have a clinical intake to assess mental health, to be honest during that intake, to follow all recommendations from that intake assessment, and to ensure that the Department receives a copy of that intake.

(*Id.* at PageID# 987–88.) Also in early September 2013, DCS filed a petition alleging that H.S. was "dependent and neglected as to [Marble] because he had failed to file a petition to legitimate [her] and had failed to protect her from [her mother's] drug use." *In re H.S.*, No. M2016-00387-COA-R3-JV, 2016 WL 7048840, at *2 (Tenn. Ct. App. Dec. 5, 2016) (*H.S. II*).

In October 2013, recognizing the limitations of his ability to be H.S.'s sole parent and consistent with the permanency plan's goal for H.S. to be in a relative's custody, Marble "approached his aunt and uncle, Will and Bobbi DuBoise, about being a possible placement for [H.S.]" *H.S. II*, 2016 WL 7048840, at *2; (Doc. No. 99-4, PageID# 1060, ¶ 3). Because the DuBoises also lived in Michigan, *H.S. II*, 2016 WL 7048840, at *2, they could not obtain custody of H.S. before the appropriate authorities in Michigan had a full opportunity to ascertain the circumstances of the proposed placement, consistent with the requirements of the Interstate Compact on the Placement of Children (ICPC). Tenn. Code Ann. § 37-4-201(b). In early 2014, DCS submitted an ICPC request to Michigan on behalf of the DuBoises and also on behalf of Marble, who was independently seeking custody. *H.S. II*, 2016 WL 7048840, at *2. The "Michigan investigator denied [Marble's] ICPC request because he could not support himself or [H.S.] and was reliant upon his grandmother for housing." *Id.* The DuBoises' ICPC request was approved in July 2014. (Doc. No. 99-2, PageID# 1035, ¶ 7; Doc. No. 99-4, PageID# 1061, ¶ 8; Doc. No. 100-1, PageID# 1144, ¶ 7.)

Shortly thereafter, DCS moved to place H.S. with the DuBoises for a trial home placement. *H.S. II*, 2016 WL 7048840, at *3. H.S.'s guardian ad litem objected, citing H.S.'s medical condition, the recent placement of other foster children into the DuBoises' home, and the fact that H.S.'s mother was still entitled to visitation in Tennessee twice a month. *Id.* H.S.'s mother also objected to the placement. *Id.* After an evidentiary hearing, the juvenile court of Macon County, Tennessee, found that it was "not in the best interest of [H.S.] to be placed in Michigan." (Doc. No. 130-1, PageID# 1399.) On the same day, the juvenile court "adjudicated [H.S.] dependent and neglected" as to Marble. *H.S. II*, 2016 WL 7048840, at *3. Marble and the DuBoises appealed the placement decision. *Id.* After a trial, the circuit court affirmed the juvenile court's finding that a placement with the DuBoises was not in H.S.'s best interest, stating:

> "[T]he problem in this case" was that Father lived in Michigan; Mother had moved to Tennessee before H.S. was born; H.S. was severely abused, and DCS needed to remove her from Mother's custody; Mother did not know where Father was at the time; DCS did not know about the DuBoises at the time; and thus H.S. was placed in a foster home, which was "an excellent foster home." After that, while DCS worked toward reunification, "time passed": Approximately 2 and 1/2 years have passed and H.S. has bonded with Foster Parents and their children. We know that if she stays in her current placement she will continue to progress.

*Id.* at *6.

On September 18, 2014, DCS moved to terminate Marble's parental rights, citing "the statutory grounds of substantial non-compliance with the permanency plan, abandonment by failure to support, and persistence of the conditions that led to the Child's removal." (Doc. No. 99-1, PageID# 1029, ¶ 19). The juvenile court terminated Marble's parental rights on the grounds of "(1) abandonment for failure to remit child support, (2) substantial noncompliance with the permanency plans, and (3) the persistence of conditions which led to removal." *H.S. I*, 2016 WL 3209444, at *7; (Doc. No. 99-1, PageID# 1031, ¶ 23). The Tennessee Court of Appeals affirmed the termination on grounds of nonpayment of child support and noncompliance with the

permanency plans, but reversed the juvenile court's finding of the persistence of conditions that led to H.S.'s removal from her mother's custody. *H.S. I*, 2016 WL 3209444, at *1; (Doc. No. 99-1, PageID# 1031, ¶ 23). The Tennessee Court of Appeals also affirmed the dependency and neglect determination. *H.S. II*, 2016 WL 7048840, at *1.

### B. Procedural History

Marble filed this lawsuit on May 4, 2014, alleging violations of Title II of the Americans with Disabilities Act (ADA) and Section 504 of the Rehabilitation Act of 1973 (Section 504). (Doc. No. 1, PageID# 32.) Marble named as defendants the State of Tennessee, DCS, former DCS Commissioner James Henry, Governor Bill Haslam, Lindsey Kenyon (the DCS case worker for H.S.), Lois Gregory (Kenyon's supervisor), Stacy Choate (DCS legal counsel), Virginia Thompkins (H.S.'s guardian ad litem from July 2013 to November 2014), Lisa Cothron (H.S.'s guardian ad litem beginning in November 2014), Camelot Care (a foster care organization that contracts with DCS), Dana Davis (H.S.'s foster mother), and Brandon Givens (H.S.'s foster father). (*Id.* at PageID# 4–10.) All defendants except the State of Tennessee and DCS have been dismissed from the action. (Doc. Nos. 51, 65, 84.)

The State and DCS filed a motion for summary judgment, supported by a memorandum of law (Doc. No. 98), a statement of undisputed facts (Doc. No. 98-1), and the deposition testimony of Marble and Lindsey Kenyon. Marble responded in opposition, filing a memorandum of law (Doc. No. 99), a response to Defendants' statement of undisputed facts (Doc. No. 99-1), a statement of additional undisputed facts (Doc. No. 99-2), and supporting evidence including affidavit testimony from proposed expert Janie L. Berryman (Doc. No. 99-3), Marble's aunt Bobbi DuBoise (Doc. No. 99-4), and Marble's attorney in these proceedings (Doc. No. 99-5), and a letter issued by the United States Departments of Justice and Health and Human Services in the matter

of Sara Gordon (the Gordon Letter), which Marble cites as persuasive authority (Doc. No. 99-6). Defendants filed a reply (Doc. No. 100) and responded to Marble's statement of additional undisputed facts (Doc. No. 100-1).

This case was transferred to the Magistrate Judge's jurisdiction by consent of the parties on January 11, 2018. (Doc. No. 127.)

## II. Legal Standard

Federal Rule of Civil Procedure 56(a) provides that summary judgment shall be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To prevail, the moving party must prove the absence of a genuine issue of material fact as to any essential element of the opposing party's claim. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23 (1986); *Stiles ex rel. D.S. v. Grainger Cty.*, 819 F.3d 834, 847 (6th Cir. 2016). In determining whether the moving party has met its burden, a court must view the factual evidence and draw all reasonable inferences in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Stiles*, 819 F.3d at 848. A court must not weigh the evidence and determine the truth of the matters asserted but instead must "determine whether there is a genuine issue for trial." *Jackson v. VHS Detroit Receiving Hosp., Inc.*, 814 F.3d 769, 775 (6th Cir. 2016) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

If the nonmoving party fails to make a sufficient showing on an essential element of the case with respect to which she has the burden, however, the moving party is entitled to judgment as a matter of law. *Martinez v. Cracker Barrel Old Country Store, Inc.*, 703 F.3d 911, 914 (6th Cir. 2013) (citation omitted). To preclude summary judgment, the nonmoving party must go beyond the pleadings and present specific facts demonstrating the existence of a genuine issue for

trial. *Shreve v. Franklin Cty.*, 743 F.3d 126, 132 (6th Cir. 2014) (citations omitted). "A mere scintilla of evidence by the nonmoving party is insufficient to defeat summary judgment; 'there must be evidence on which the jury could reasonably find for the [nonmoving party].'" *St. Clair Marine Salvage, Inc. v. Bulgarelli*, 796 F.3d 569, 574 n.2 (6th Cir. 2015) (alteration in original) (quoting *Anderson,* 477 U.S. at 252). If the evidence offered by the nonmoving party is "merely colorable," "not significantly probative," or not enough to lead a fair-minded jury to find for the nonmoving party, the motion for summary judgment may be granted. *Anderson*, 477 U.S. at 249–52.

## III. Analysis

Defendants argue that they are entitled to summary judgment for two reasons. First, they assert immunity from Marble's claims under the Eleventh Amendment. (Doc. No. 98, PageID# 837.) Second, they argue that, even if they are subject to liability, Marble cannot support the claims of disability discrimination that he alleges. (*Id.* at PageID# 839–44.) Because the Court finds that no genuine issue of material fact exists in the record that Marble experienced discrimination on the basis of his disability, the Court addresses Defendants' sovereign immunity argument only briefly.

The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State . . . ." U.S. Const. amend. XI. "The desire to protect the solvency and dignity of the states motivates the doctrine of Eleventh Amendment sovereign immunity." *Lowe v. Hamilton Cty. Dep't of Job & Family Servs.*, 610 F.3d 321, 324 (6th Cir. 2010) (citing *Hess v. Port Auth. Trans-Hudson Corp.*, 513 U.S. 30, 52 (1994)). An entity that is considered an "arm of the state," like DCS, may also invoke a sovereign immunity defense. *See Ernst v. Rising*, 427 F.3d 351, 359 (6th Cir. 2005) (citing *S.J. v. Hamilton Cty.*, 374 F.3d 416, 420

(6th Cir. 2004)); *Harness v. Tenn. Dep't of Children's Servs.*, No. 3:09-CV-15, 2009 WL 2601840, at *2–3 (E.D. Tenn. Aug. 24, 2009).

### A. Sovereign Immunity

Congress can abrogate state sovereign immunity "pursuant to the enforcement provisions of § 5 of the Fourteenth Amendment when Congress both 'unequivocally intends to do so and 'act[s] pursuant to a valid grant of constitutional authority.'" *Babcock v. Michigan*, 812 F.3d 531, 534 (6th Cir. 2016) (alteration in original) (quoting *Bd. of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356, 363 (2001)). Although Congress has expressed an unequivocal desire to abrogate the Eleventh Amendment for violations of the ADA via its Fourteenth Amendment authority, *see* 42 U.S.C. §§ 12101(b)(4), 12202, whether sovereign immunity is abrogated in a particular action is determined by looking to "the nature of the ADA claim" alleged. *Babcock*, 812 F.3d at 534 (collecting cases).

If a plaintiff alleges "conduct that *actually* violates the Fourteenth amendment, Title II validly abrogates state sovereign immunity." *United States v. Georgia*, 546 U.S. 151, 159 (2006) (emphasis in original). In assessing whether a given claim under Title II of the ADA can overcome sovereign immunity, courts must determine: "(1) which aspects of the State's alleged conduct violated Title II; (2) to what extent such misconduct also violated the Fourteenth Amendment; and (3) insofar as such misconduct violated Title II but did not violate the Fourteenth Amendment, whether Congress's purported abrogation of sovereign immunity as to that class of conduct is nevertheless valid." *Id.* Because the Court finds that no genuine issue of material fact exists as to Marble's claim that Defendants violated Title II, the Court does not engage in the constitutional analysis. *See Babcock*, 812 F.3d at 539 (explaining that, without having "identif[ied] ADA-violating conduct, [the Sixth Circuit could not] hold that Congress abrogated the states' sovereign immunity by a valid exercise of its power under § 5 of the Fourteenth Amendment").

## B. Disability Discrimination Under the ADA and Section 504

Invoking its power "to enforce the fourteenth amendment and to regulate commerce," Congress passed the ADA with the aim of protecting people with disabilities from discrimination in three "major areas:" employment (Title I); public services, programs, and activities (Title II); and public accommodations (Title III). 42 U.S.C. §§ 12101(b)(4), 12111–17, 12131–34, 12181–89. Title II provides that:

> no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

42 U.S.C.A. § 12132. A "qualified individual with a disability" is one who, "with or without reasonable modifications to rules, policies, or practices, . . . or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." *Id.* § 12131(2). The term "public entity" extends to "any state or local government" and also "any department, agency, . . . or other instrumentality of a State or . . . local government." *Id.* § 12131(1)(A)–(B).

Title II represents an expansion of Section 504, which reaches only discrimination in programs or activities that receive federal financial aid. Section 504 provides that:

> No otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service.

29 U.S.C. § 794(a). "Apart from [Section 504's] limitation to denials of benefits 'solely' by reason of disability and its reach of only federally funded—as opposed to 'public'—entities, the reach and requirements of both statutes are precisely the same." *S.S. v. E. Ky. Univ.*, 532 F.3d 445, 452–53 (6th Cir. 2008) (quoting *Weixel v. Bd. of Educ. of N.Y.*, 287 F.3d 138, 146 n.6 (2d Cir. 2002)).

That parity extends to enforcement as well—Title II incorporates "[t]he remedies, procedures, and rights set forth in section 794a [of the Rehabilitation Act] . . . ." 42 U.S.C. § 12133. Title II and Section 504 generally recognize three types of discrimination claims: "(1) the defendant intentionally discriminated on the basis of the disability, (2) the defendant refused to provide a reasonable modification,[2] or (3) the defendant's rule disproportionally impacts disabled people." *Washington v. Ind. High Sch. Athletic Ass'n, Inc.*, 181 F.3d 840, 847 (7th Cir. 1999) (citing *McPherson v. Mich. High Sch. Athletic Ass'n, Inc.*, 119 F.3d 453 (6th Cir. 1997)).

In his response in opposition to Defendants' motion for summary judgment, Marble distills his claims as follows:

> (1) DCS failed to do an individualized assessment of Marble's needs and limitations as a parent in violation of [the] ADA; (2) DCS refused to consider Marble's extended family and their willingness to do whatever was necessary to help; (3) DCS refused to transfer H.S. to Marble's aunt and uncle which would have maintained the integrity of the family; and (4) DCS intentionally imposed requirements on Marble that were beyond his capabilities allowing them to pursue termination.

(Doc. No. 99, PageID# 1013.)[3]

Marble does not directly identify his claims as charging intentional discrimination on the basis of disability or a failure to reasonably accommodate his disabilities, and his arguments and

---

[2]     Failure to make a reasonable accommodation is explicitly included within the definition of discrimination in Title I and Title III. 42 U.S.C. §§ 12112(b)(5)(A), 12182(b)(2)(A)(ii). The Seventh Circuit analyzed the legislative history of the ADA to conclude that "the methods of proving discrimination under Titles I and III of the ADA also apply to Title II." *Washington*, 181 F.3d at 848. That reading is consistent with the regulations implementing Title II, which provide that "[a] public entity shall make reasonable modifications in policies, practices, or procedures when the modification is necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program or activity." 28 C.F.R. § 35.130(b)(7)(i); *see McNamara v. Ohio Bldg. Auth.*, 697 F. Supp. 2d 820, 826–27 (N.D. Ohio 2010) (citing 28 C.F.R. § 35.130(b)(7)(i)).

[3]     To the extent Marble includes additional claims in his amended complaint (Doc. No. 88), the Court assumes that he has abandoned those claims at summary judgment.

those made by Defendants weave between both theories of liability. The Court will therefore address Marble's claims under both theories as well.

### 1. Intentional Discrimination

To establish "intentional discrimination under Title II of the ADA, [Marble] must show that: (1) [he] has a disability; (2) [he] is otherwise qualified; and (3) [he] was being excluded from participation in, denied the benefits of, or subjected to discrimination under the program because of [his] disability." *Anderson v. City of Blue Ash*, 798 F.3d 338, 357 (6th Cir. 2015). Discrimination occurs "because of" a plaintiff's disability when there is "sufficiently 'significant' evidence" that "animus toward the disabled" motivated the protested behavior. *Gohl v. Livonia Pub. Sch. Sch. Dist.*, 836 F.3d 672, 682 (6th Cir. 2016) (quoting *Anderson*, 798 F.3d at 357). "The Rehabilitation Act sets the higher bar, requiring plaintiffs to show that the defendant's acts were done '*solely* by reason of' the disability." *Id.* (alteration in original) (quoting 29 U.S.C. § 794(a)). For purposes of summary judgment, Defendants assume that Marble is a qualified individual with a disability. (Doc. No. 98, PageID# 840.)

Defendants make a preliminary argument that Marble has not identified a "program" of which he was denied benefits. (*Id.*) That argument is not persuasive. Title II extends to DCS's efforts to design and implement Marble's permanency plans and to DCS's conduct during the termination proceeding. The scope of Title II's coverage—"services, programs, or activities"—lends itself to a broad reading. 42 U.S.C. § 12132; *see Babcock*, 812 F.3d at 540 (interpreting the phrase "services, programs, or activities," 42 U.S.C.A. § 12132, "to encompass[] virtually everything that a public entity does") (alteration in original) (quoting *Johnson v. City of Saline*, 151 F.3d 564, 569 (6th Cir. 2016)); *see also Johnson*, 151 F.3d at 569 (noting that "the word 'activities,' on its face, suggests great breadth and offers little basis to exclude any actions of a public entity."); 28 C.F.R. § 35.102(a) (applying Title II to "all services, programs, and activities

provided or made available by public entities"). Because of the breadth of that language, courts have assumed without explicitly deciding that the actions of child welfare agencies are subject to Title II. *See Schweitzer v. Crofton*, 935 F. Supp. 2d 527, 552–56 (E.D.N.Y. 2013); *M.K. ex rel. Mrs. K. v. Sergi*, 554 F. Supp. 2d 175, 182, 194–99 (D. Conn. 2008); *Ward v. Murphy*, 330 F. Supp. 2d 83, 98–99 (D. Conn. 2004). This conclusion is bolstered by the Gordon Letter,[4] which construed Title II and Section 504 as reaching "everything [the Massachusetts Department of Children and Families] does, including its investigations, assessments, removals, family preservation, provision of services, determining goals and permanency plans, setting service plan tasks, reunification, guardianship, adoption, [] assisting clients in meeting such tasks" and "recommendations and petitions related to child welfare matters and proceedings to terminate parental rights." (Doc. No. 99-6, PageID# 1074 & n.11.) The Court finds that Title II extended to DCS's actions in this matter.

Summary judgment is nonetheless appropriate on this claim, however, because Marble offers no evidence to support a finding that Defendants intentionally discriminated against him because of his disabilities. Marble must present "'significant' evidence of animus toward the disabled that is a but-for cause of the discriminatory behavior." *Gohl*, 836 F.3d at 682 (quoting *Anderson*, 798 F.3d at 357). He has not met that substantial burden.

Marble identifies three instances in which he felt discriminatory animus from DCS. Marble testified that he felt that DCS workers "looked at [him] like [he] was downright stupid," and that

---

[4]     This letter, as Defendants emphasize (Doc. No. 100, PageID# 1139), is not binding on the Court, but is persuasive authority. *See United States v. Mead Corp.*, 533 U.S. 218, 228 (2001) (explaining that "[t]he fair measure of deference to an agency administering its own statute" depends on the extent of the agency's care, its consistency, formality, and relative expertness," and on the "persuasiveness of the agency's position") (citations omitted). It is also consistent with Sixth Circuit precedent favoring a broad interpretation of Title II. *See Babcock*, 812 F.3d at 540.

his disabilities were "part of" the reason that an unidentified DCS worker accused him of "talking derogative in front of [H.S.]" and "stealing a 25-cent vegetable." (Doc. No. 98-2, PageID# 933:14–21, 935:8–11.) Marble testified that those accusations were false and that the DCS staff members were trying to take advantage of the fact that he is "a little slow," "very forgetful," and "not the brightest." (*Id.* at PageID# 933:14–21, 934:6–22.)

Defendants argue, however, that Marble has not linked that alleged discriminatory animus to any decision leading to the termination of his parental rights or shown that, in fact, his disabilities prevented him from meeting the permanency plan. (Doc. No. 98, PageID# 840.) Defendants argue, citing *H.S. I*, that Marble's parental rights were terminated because of his failure to support H.S. and his failure to meet the terms of the permanency plan by establishing a suitable residence and demonstrating a legal source of income which, in turn, were not caused by his disabilities. [5] (*Id.* (citing *H.S. I*, 2016 WL 3209444).)

More importantly, Defendants cite Marble's deposition testimony in which he testified as to the connection between his disabilities and his failure to meet the requirements of the permanency plan. (Doc. No. 98-1, PageID# 851, ¶ 21.) Regarding whether his disabilities prevented him from maintaining stable housing, Marble testified as follows:

---

[5]    In their supplemental briefing on the sovereign immunity issue, Defendants state that "two proceedings in the Tennessee state courts have resulted in final judgments and determinations of facts [that are] relevant to [Marble's] ADA claims" and "entitled to preclusive effect."(Doc. No. 130, PageID# 1392 (referencing *H.S. I* and *H.S. II*).) "Those facts include that [Marble] does not have a disability that prevents him from holding a job, having a driver's license, or obtaining his GED" and that DCS did "everything [it] could to get this child back to its parents." (*Id*. (quoting *H.S. II*, 2016 WL 7048840, at \*6, 11).) The "burden of raising issue preclusion and demonstrating that its requirements [are] satisfied" rests with Defendants, and the Court finds that they have not met that burden here. *Comm. to Impose Term Limits on the Ohio Supreme Court & to Preclude Special Legal Status for Members & Emps. of the Ohio Gen. Assembly v. Ohio Ballot Bd.*, 885 F.3d 443, 447 n.1 (6th Cir. 2018). The factual determinations made by the Tennessee Court of Appeals are therefore not given preclusive effect in the Court's analysis.

| Q. | Did anyone from DCS ever tell you that you needed to have your own house? |
|---|---|
| A. | That was my understanding. |
| Q. | And why was that your understanding? |
| A. | Because that's just the way they made it sound. It was more - -  I'm sorry. The way DCS had explained it was that I needed to find a place of my own to maintain for six months and also have a job. So that became my understanding. And then later on, I do believe asking if I lived with, you know, someone like my grandmother or an aunt, if that would be okay. |
| Q. | And would it? |
| A. | I do believe they said that would be. |
| Q. | And how did your disabilities prevent you from doing that? |
| A. | They didn't. But in one way, the case did, because I do believe that when it came to living with my aunt, because she was trying to be a part of the case, I couldn't live with her just in case H.S. needed to be put in her custody. |

(Doc. No. 98-2, PageID# 925–26.)

Marble was also asked about how his disabilities affected the requirement that he maintain employment[6] and pay child support:

| Q. | Okay. And what reason were you not able to comply with the requirements to get a home and have a job? |
|---|---|
| A. | The home, I didn't see my home as a problem. The job, again, just my physical disability. |
| Q. | And transportation issues is what you told me? |
| A. | Yeah. |
| Q. | And those transportation issues are what we've already covered with respect to your driver's license and ability to get a ride from other people, right? |
| A. | Yes, sir. |
| Q. | Did you understand your disabilities to prevent you from paying child support to DCS? |
| A. | No. |
| Q. | What was the reason that you didn't do that? |
| A. | Mainly getting the job and, you know, maintaining one. And also, I had a lot of bills to pay. And trying to level things out, I wasn't very good at that in my, you know, younger years. |

---

[6]     The parties dispute whether the permanency plan required Marble to maintain employment or just a legal source of income (which could include public benefits). (Doc. No. 99-1, PageID# 1026, ¶ 13.)  As discussed below, Defendants argue that, even if the plan were construed to have required Marble to maintain employment, the record shows that his disabilities did not prevent him from meeting that condition. (Doc. No. 98, PageID# 841.)

(*Id.* at PageID# 928–29.) Defendants argue that, even if Marble did have disability-related transportation issues (which they dispute),[7] that did not prevent Marble from obtaining employment, "as is evidenced by the plethora of jobs Marble has held since dropping out of school." (Doc. No. 98, PageID# 841.) At the time of his deposition, Marble had been employed at Papa John's for "for seven or eight months." (Doc. No. 98-2, PageID# 892:18–20.)

Marble agrees that "the sole reason for the termination of his parental rights arose from his inability to meet the requirements placed on him by the State agency." (Doc. No. 99, PageID# 1018.) He argues that his failure to meet the plan requirements nonetheless results from discrimination because "DCS intentionally imposed requirements on [him] that were beyond his capabilities allowing them to pursue termination." (*Id.* at PageID# 1007.) Marble's primary support for this assertion is the affidavit testimony of Dr. Janie L. Berryman "that the disabilities of Mr. Marble were known to DCS in the first meeting held September 5, 2013; that Mr. Marble's disabilities interfered with his ability to get a GED, Mr. Marble otherwise lacked skills, education, and experience to obtain consistent employment; and due to his limitations, the permanency plan was built for Mr. Marble to fail."[8] (*Id.* (citing Doc. No. 99-3, PageID# 1041, ¶ 8).) Marble also

---

[7]     Defendants argue that the only reason that Marble was reliant on others for transportation prior to the termination of his parental rights was that "he never applied for a driver's license." (Doc. No. 98, PageID# 841.)

[8]     Defendants argue that the Court should not consider Dr. Berryman's affidavit testimony because "Dr. Berryman lacks the qualifications to make such an assessment[,] . . . did not base her opinion on generally accepted scientific principles and methods[,] [and] never spoke with anyone at DCS . . ." (Doc. No. 100-1, PageID# 1145, ¶ 12.) Therefore, "any attempt to guess at DCS's intentions is pure speculation and is not entitled to weight on summary judgment." (*Id.*) The Court need not determine whether Berryman's testimony would be admissible at trial because her conclusory and unsupported affidavit testimony is given little weight in the Court's analysis. *See Schweitzer*, 935 F. Supp. 2d at 555 ("Even if Dr. Lubit qualified as an expert under the Federal Rules of Evidence, his largely conclusory affidavit adds nothing in the way of evidentiary support" for plaintiffs' discrimination claim.)

cites Kenyon's deposition testimony to show that DCS did not take his disabilities into account in creating the permanency plan. (*Id.* at PageID# 1016.) Marble argues that "[t]here is nothing in Kenyon's testimony accounting for the known disabilities of Marble and how they would affect his ability to meet the requirements of becoming a safe and effective parent." (*Id.*)

Viewed in the context of the whole record, the proof Marble offers is not sufficient to create a genuine issue of material fact that Defendants intentionally discriminated on the basis of his disabilities in creating the permanency plan's requirements. Dr. Berryman's conclusory assertion that "the permanency plan was built for Mr. Marble to fail" is based on an assumption that is unsupported by the record—that DCS, in designing and implementing the permanency plan, knew that Marble's disabilities would prevent him from meeting its terms. In his own deposition testimony, Marble states that he could not remember ever telling DCS that his disabilities would prevent him from complying with the permanency plan (Doc. No. 98-2, PageID# 860:4–8, 862–63, 864–65.) When asked whether, at the time, he believed that his disabilities were preventing him from doing what DCS was asking him to do, Marble responded: "I never really put thought into it." (*Id.* at PageID# 927:11–13.)

Further, Marble testified that his interactions with Kenyon were largely positive, undermining any inference that discrimination motivated any failure by Kenyon "to account for the known disabilities of Marble" in designing and implementing the permanency plans. (Doc. No. 99, PageID# 1016.) Marble testified that Kenyon helped him "quite a bit" to understand the permanency plan when he was confused and that he knew he could reach out to Kenyon at any time if he had trouble comprehending documents. (Doc. No. 98-2, PageID# 931:11–15, 932:7–14). Marble also testified that Kenyon "has done a pretty good job of treating [him] with the utmost respect." (*Id.* at PageID# 935:17–19.) Marble's only complaint with respect to Kenyon was that

she did not do enough to help him find resources like parenting classes and other services in Michigan, where he was living. (*Id.* at PageID# 932:15–25, 940:3–22; Doc. No. 99-1, PageID# 1031, ¶ 22.)

More generally, the petition for termination of Marble's parental rights does not evince disability-based animus. The petition sought termination based on Marble's failure to pay child support, failure to comply with the conditions of the permanency plan, and persistence of the conditions that led to H.S.'s removal. (Doc. No. 98-3, PageID# 985–92.) DCS stated the following regarding Marble's failure to meet the conditions of the permanency plan:

> [Marble] has not followed the recommendations from his mental health assessment. He was very slow to get the assessment saying he wanted to do it in Michigan. Finally the DCS case manager scheduled it for him in Tennessee. He has not paid child support. He cannot provide housing. He has not provided proof of payment of utilities other than his statement that he paid the internet bill at his grandmother's house which he pays for the purpose of his on-line gaming via XBOX. He cannot support himself and has not provided proof of income. He has not demonstrated proper parenting skills.

(*Id.* at PageID# 989–90.) As Defendants point out, the grounds for termination in Marble's case did not "rel[y] on assumptions about [the parent's] disabilities that may have prevented appropriate parenting." (Doc. No. 100, PageID# 1139.) Although DCS did reference Marble's mental health assessment in pursuing termination, it did so not to highlight Marble's "cognitive limitations" and their effect on his parenting, but instead to show that he failed to comply with his counselor's recommendations, including participation in individual counseling, involvement in his child's medical care, completion of his GED, and continued pursuit of employment.[9] *See Schweitzer*, 935

---

[9] In his amended complaint, and in his supplemental summary judgment brief, Marble does point out that DCS expressed concern that his disabilities might affect his ability to be the sole parent. (Doc. No. 88, PageID# 758, ¶ 33, 761–62, ¶ 43; Doc. No. 129, PageID# 1386.) The permanency plan states that "Mr. Marble has a medical condition that poses a risk to solely care for the child," and later, "Mr. Marble has a seizure disorder that may affect his ability to be the sole parent. (Doc. No. 98-3, PageID# 954, 964.) But that language cannot support an inference of

F. Supp. 2d at 554 (concluding that defendants had not engaged in disability-based discrimination by finding that plaintiff-mother's history of noncompliance with psychiatric treatment weighed in favor of removing her child from her custody: "[d]efendants only took into consideration the *fact* that Plaintiff had a history of noncompliance—information that would be relevant regardless of Plaintiff's mental disability") (emphasis in original); *H.S. I*, 2016 WL 3209444, at *4. The petition to terminate Marble's parental rights "relied on wide-ranging evidence pertaining to [Marble's] conduct[] and behavior" and therefore does not support the conclusion that it was driven by ableist discrimination. *Bartell v. Lohiser*, 215 F.3d 550, 560 (6th Cir. 2000); *see Schweitzer*, 935 F. Supp. 2d at 555–56 ("Defendants based their decision to remove [the plaintiff's child] on a wide-range of evidence pertaining to [mother's] conduct and behavior that raised concerns regarding [her] ability to care for [her child], not based on her disability").

To avoid summary judgment on his claim that "DCS intentionally imposed requirements on [him] that were beyond his capabilities allowing them to pursue termination" (Doc. No. 99, PageID# 1013), Marble "cannot rest on [his] pleadings" and instead must "come forward with specific facts demonstrating that there is a genuine issue for trial:" that discrimination caused the harm he asserts. *Roberson v. Cendant Travel Srvs., Inc.*, 252 F. Supp. 2d 573, 576 (M.D. Tenn. 2002) (internal citations omitted). Marble has not offered sufficient proof to meet that burden, and,

---

animus at the summary judgment stage. First, neither of the quoted fragments from the permanency plan expresses a conclusive, stereotype-driven judgment that Marble would not be able to solely parent H.S. because of his disabilities; instead, the permanency plan states that Marble's medical condition poses an unquantified "risk" and that Marble's seizure disorder "may" affect his ability to be H.S.'s sole caretaker. (*Id.*) Consistent with that more ambivalent language, the permanency plan required Marble to get a mental health assessment "in regards to his seizure disorder and how that affects/ if any his ability to parent H.S. independently." (Doc. No. 98-3, PageID# 964.) Finally, the petition to terminate Marble's parental rights did not mention Marble's disabilities as an impediment to parenting H.S. and instead focused on his noncompliance with the terms of the permanency plan. (*Id.* at PageID# 989–90.)

from the evidence in the record, a reasonable jury could not conclude that Defendants violated the ADA and Section 504 by "intentionally impos[ing] requirements on Marble that were beyond his capabilities" so that it could "pursue termination." (Doc. No. 99, PageID# 1013.) Defendants are entitled to summary judgment with respect to Marble's claim of intentional discrimination.

### 2. Failure to Make a Reasonable Accommodation

To succeed on a claim that Defendants failed to provide reasonable accommodation for Marble's disabilities in creating the permanency plan, as Marble alleges, he must show that Defendants "could have reasonably accommodated [him] and refused to do so." *McNamara v. Ohio Bldg. Auth.*, 697 F. Supp. 2d 820, 828 (N.D. Ohio 2010) (quoting *McPherson*, 64 F.3d at 461). To meet that standard, a plaintiff must generally establish as a first step that he requested a reasonable accommodation. *Gantt v. Wilson Sporting Goods Co*, 143 F.3d 1042, 1047 (6th Cir. 1998).[10] A plaintiff must also show that the relevant reasonable accommodation was "necessary to avoid discrimination." 28 C.F.R. § 35.130(b)(7)(i); *McNamara*, 697 F. Supp. 2d at 828–29. An

---

[10]     Although *Gantt*'s holding that a failure to request an accommodation defeats a reasonable accommodation claim emerged in the context of Title I, courts in the Sixth Circuit have applied that holding in the context of Title II. *See Stewart v. Proctor & Gamble Co.*, No. C-1-04-721, 2008 WL 4144767, at *11 (S.D. Ohio Mar. 31, 2008) ("Regardless of whether a reasonable accommodation existed, the undisputed evidence indicates that Plaintiff never requested an accommodation related to any disability she thought she had"); *Watson v. City of Mason*, No. C-1-04-282, 2005 WL 3018690, at *5 (S.D. Ohio Nov. 9, 2005) ("As there is no evidence in the record that Plaintiff made a request for accommodation, Plaintiff has failed to create an issue of fact as to whether Defendant failed to provide a reasonable accommodation for her disability"); *see also Logan v. Matveevskii*, 57 F. Supp. 3d 234, 260, 264 (S.D.N.Y. 2014) (explaining that "cases involving reasonable-accommodation claims brought under Title I of the ADA are useful interpretive tools for analyzing reasonable-accommodation claims brought under Title II of the ADA, the Rehabilitation Act, and the FHA" and proceeding to hold that "because Plaintiff never requested an accommodation based on his comfort level with 31 Midland Place, the THA Defendants cannot be held responsible for having failed to provide one"). To the extent that such a rule is inconsistent with the guidance that the Gordon Letter offers, the Court finds that the Gordon Letter is not controlling. (*See* Doc. No. 99, PageID# 1009 (citing Doc. No. 99-6).)

accommodation is not reasonable if it would "fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7)(i).

In the context of Title III, the Supreme Court has held that, when an accommodation has been requested, an "individualized inquiry must be made to determine whether a specific modification for a particular person's disability would be reasonable under the circumstances . . ." *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 688 (2001). Courts have applied the individualized inquiry requirement in Title II cases. *Wright v. N.Y. State Dep't of Corr.*, 831 F.3d 64, 77 (2d Cir. 2016) (collecting cases and noting that such an extension is consistent with Title II's implementing regulations). Yet a failure to make an individualized inquiry is not necessarily an independent violation of the ADA; the Sixth Circuit has held that, in the context of employment discrimination actions, a failure to conduct an individualized inquiry "is only an independent violation of the ADA if the plaintiff establishes a prima facie showing that he proposed a reasonable accommodation," *Rorrer v. City of Stow*, 743 F.3d 1025, 1041 (6th Cir. 2014), or "that a reasonable accommodation was possible." *Keith v. County of Oakland*, 703 F.3d 918, 929 (6th Cir. 2013). Conditioning the individualized inquiry requirement on a showing that a reasonable accommodation was within reach recognizes that such an inquiry is "a means and not an end in itself," *Rehling v. City of Chicago*, 207 F.3d 1009, 1016 (7th Cir. 2000), and ensures that defendants are not held liable when "there was no possible way . . . to accommodate the [plaintiff's] disability." *Willis v. Conopco, Inc.*, 108 F.3d 282, 285 (11th Cir. 1997).

The only accommodation that Marble explicitly references in his summary judgment briefing is placement of H.S. with the DuBoises.[11] Marble cites the Gordon Letter to argue that

---

[11] Marble's amended complaint is similar. The only accommodation that Marble mentions specifically is "a transfer of [H.S.] to [Marble's] Aunt Bobbi DuBoise." (Doc. No. 88, PageID# 752, ¶ f.) Otherwise, Marble makes many vague references to reasonable accommodations or

"placement with relatives who offer financial support and stability is a reasonable accommodation . . . for parents whose disability prevent[s] them [from] providing a stable source of income." (Doc. No. 99, PageID# 1015.) However, by claiming that DCS failed to conduct an individualized inquiry into how his disabilities would affect his compliance with the terms of the permanency plans, Marble also suggests that modification of the plan's terms to accommodate his disabilities could also have been a reasonable accommodation. (*See* Doc. No. 99, PageID# 1015–16.) The Court addresses both of these theories.

Marble's reasonable accommodation claims fail, however, because the evidence in the record, even when viewed in the light most favorable to Marble, does not establish that he ever requested accommodation for his disabilities. In his deposition, Marble was asked whether he had notified DCS that any of his disabilities were preventing him from complying with the terms of the permanency plan and testified as follows:

> Q.    Did you ever have a conversation with DCS saying, you know, "There's this thing I'm supposed to do and I can't do it because of my seizures and my memory issues"?
> A.    Not that I recall.
>
> . . .
>
> Q.    So your knee kept you from walking back and forth to work? Is that what I understand you to say?
> A.    Yes.
> Q.    Were there any other elements of the permanency plan that you couldn't do because of your knee?
> A.    Not that I can really remember because I don't remember much of what's on the permanency plan.

---

modifications that should have been provided. (*Id.* at PageID# 750, ¶ 11; 751, ¶ 10; 752, ¶ c; 753, ¶ h; 758, ¶ 32; 759, ¶ 33; 762, ¶¶ b, 44; 763, ¶ 45; 765, ¶ c; 769, ¶ 57; 777, ¶ 72.) One of those references is slightly more specific—Marble alleges that DCS "offered no accommodations or modifications commensurate with [his] skill level that would enhance his access to various social services or that would facilitate his reunification with his daughter." (*Id.* at PageID# 765, ¶ c.)

> Q. All right. Well, like I said, we'll get it out and look at it in a minute. Did you ever tell anyone at DCS, "Hey, I can't walk back and forth to work because of my knee pain"?
>
> A. Not that I recall.
>
> . . .
>
> Q. Did you ever tell anyone at DCS, "Hey, I can't do this thing that you're asking of me because I have this depression"?
>
> A. Not that I can remember.
>
> . . .
>
> Q. Did you say to any DCS worker, "there are things on this list that I can't do because I can't see out of my left eye"?
>
> A. I did mention that I had trouble reading.
>
> Q. And that's a product of the partial blindness?
>
> A. Yeah.

(Doc. No. 98-2, PageID# 860:4–8, 862–63, 864–65.) Marble was also asked if he had ever requested an accommodation for his disabilities:

> Q. Did you ever ask DCS to accommodate your disabilities?
>
> A. Not that I remember. (Doc. No. 98-2, PageID# 927:8–10.)
>
> Q. Did you believe that your disabilities were preventing you from doing what DCS wanted you to do?
>
> A. I never really put thought into it.

(*Id.* at PageID# 927:8–13.) Defendants argue that Marble's testimony establishes that he never requested an accommodation or informed DCS that his disabilities were preventing him from complying with the terms of the permanency plan. (Doc. No. 98-1, PageID# 848–49, ¶¶ 7, 9, 11.) Marble counters that his testimony reveals only that he does not remember communicating with DCS about those topics (Doc. No. 99-1, PageID# 1024–25, ¶¶ 7, 9, 11) and points out that, at the outset of his deposition, he stated:

> I have really big trouble remembering things, just in general, due to my seizure disorder. Like mainly, I can't remember a majority of this case. And so I honestly am sorry if there's fault memories or anything. I'll answer to the best of my abilities.

(Doc. No. 98-2, PageID# 856:17–22.)

The Court does not take lightly the fact that Marble experiences memory failures because of his seizure disorder and recognizes the difficulties that Marble has testified that this has caused in the pursuit of his claims. However, Marble cannot substantiate his claims based on the absence of evidence. "[T]he initial burden of requesting an accommodation under the ADA rests with [him]." *Watson v. City of Mason*, No. C-1-04-283, 2005 WL 3018690, at *5 (S.D. Ohio Nov. 9, 2005) (citing *Gantt*, 143 F.3d at 1046–47 n.4). Marble has established that DCS was aware of his disabilities (Doc. No. 100-1, PageID# 1146, ¶ 16), but not that he ever requested an accommodation or even informed DCS that his disabilities would prevent him from being able to do what the permanency plan required. DCS's mere knowledge of his disabilities is not sufficient to support his claim. *See Watson*, 2005 WL 3018690, at *5 (explaining that, "[w]hile Plaintiff may have generally discussed her disability with court personnel, she did not inform anyone with the City that she had problems navigating stairs as a result of her disability"). In the complete absence of proof that Marble ever requested an accommodation of his disabilities, Defendants are entitled to summary judgment on Marble's claims.[12] *See Logan v. Matveevskii*, 57 F. Supp. 3d 234, 260 (S.D.N.Y. 2014) (finding that, "because Plaintiff never requested an accommodation based on his

---

[12]    In his amended complaint, Marble states that, given his "cognitive disabilities," "he was unable to comprehend the full import of [the ermanency plan] or even effectively challenge its contents." (Doc. No. 88, PageID# 765, ¶ d.) He appears to have abandoned that argument, as he does not repeat it in his summary judgment briefing. Nonetheless, although some courts have held that an ADA plaintiff who has a mental disability that "impairs the [plaintiff's] ability to request an accommodation" may be exempt from the normal rule that a request for a reasonable accommodation is needed to trigger liability, the record does not support application of such an exemption in this case. *Moloney v. Home Depot U.S.A., Inc.*, No. 11-10924, 2012 WL 1957627, at *13–14 (E.D. Mich. May 31, 2012) (collecting cases). When Marble was asked if he ever requested an accommodation from his prior employer EPI, a packaging company, Marble said: "Yeah, and they told me because I couldn't do [the cleaning tasks due to my knee injury], that they would just put me on something else." (Doc. No. 98-2, PageID# 878:7–10.) The record thus offers no support for the proposition that Marble is incapable of requesting an accommodation when he believes he needs one.

comfort level with 31 Midland Place, the THA Defendants cannot be held responsible for having failed to provide one"); *Ely v. Mobile Housing Bd.*, 13 F. Supp. 3d 1216, 1233 (S.D. Ala. 2014) (granting defendant's motion for summary judgment where the record did not support the inference that plaintiff had "request[ed] an extension of [her housing voucher] as an accommodation for his disability"); *Stewart v. Proctor & Gamble Co.*, No. C-1-04-721, 2008 WL 4144767, at *11 (S.D. Ohio Mar. 31, 2008) (granting defendant's motion for summary judgment where the "undisputed evidence indicate[d] that Plaintiff never requested an accommodation related to any disability she thought she had"); *Watson*, 2005 WL 3018690, at *5 (explaining that, "[a]s there is no evidence in the record that Plaintiff made a request for accommodation, Plaintiff has failed to create an issue of fact as to whether Defendant failed to provide a reasonable accommodation for her disability").

Even if that were not the case, Marble's failure-to-accommodate claim based on DCS's alleged refusal to place H.S. with the DuBoises fails for an independent reason—the accommodation of a relative placement ceased to be reasonable after DCS was blocked from implementing it by the juvenile court. Marble claims that "DCS refused to consider [his] extended family and their willingness to do whatever was necessary to help" and that "DCS refused to transfer H.S. to Marble's aunt and uncle which would have maintained the integrity of the family." (Doc. No. 99, PageID# 1013.) That was so despite the fact that the DuBoises "completed all the requirements, including the [ICPC] . . ." (*Id.* at PageID# 1006.) Defendants assert that, once the ICPC was completed,[13] DCS tried to transfer custody to the DuBoises but that "the Tennessee

---

[13]     In his amended complaint, Marble claims that case worker Linsey Kenyon's "direct interference with the commencement of [the ICPC] process was [] intended to halt [Marble's] eventual ability to parent his child through the assistance of family." (Doc. No. 88, PageID# 766, ¶ 51.) He also claims that Kenyon wrote "a letter to interfere with the approval of the ICPC placement of [H.S.]" (*Id.* at PageID# 770, ¶ 64.) Marble does not reiterate either of those claims in his summary judgment briefing (Doc. Nos. 99, 129). However, in his statement of additional undisputed material facts, he does assert that the ICPC documents DCS submitted to Michigan

courts found that it would not be in the child's best interest" to do so. (Doc. No. 100, PageID# 1140.)

Nonetheless, Marble faults Defendants for the failure to place H.S. with the DuBoises and not the courts that found that such a placement would not have been in H.S.'s best interests. Marble argues that "initial determinations respecting [residential] placements [of children] are the *responsibility and prerogative of* [DCS]" and therefore DCS did not need the permission of the trial court to place H.S. with the DuBoises. (Doc. No. 99, PageID# 1014–15 n.3) (citing *State of*

---

"showed that DCS had delayed the ICPC request until February 1, 2014. (Doc. No. 99-2, PageID# 1035, ¶ 8.) To support that assertion, Marble cites the affidavit of Bobbi DuBoise, in which DuBoise states that Kenyon "had not filed a request for an ICPC on our family until February 2014." (*Id.* (citing Doc. No. 99-4, PageID# 1061, ¶ 7).) Defendants' respond that "DuBoise's statements related to her interpretation of the content of 'the DCS documents' is inadmissible hearsay and not entitled to any weight on summary judgment." (Doc. No. 100-1, PageID# 1144, ¶ 8.)

There is no need to determine whether DuBoise's statement is admissible, because, without more argument from Marble, the Court cannot conclude that any dispute about the existence of a delay in the ICPC process is material to the question of whether DCS "could have reasonably accommodated [Marble] and refused to do so." *McNamara*, 697 F. Supp. 2d at 828. Marble makes no effort to connect the delay in commencement of the ICPC process to the ultimate denial of the relative placement, though the implication of his reference to the delay is that an earlier start would have produced a different outcome in the state courts. The fact that the circuit court focused on the passage of time in affirming the denial of the relative placement lends some support to Marble's implied argument, but that support is undermined by the presence of other delays that were outside of DCS's control, such as the failure of the DuBoises to include their foster license in their initial ICPC application (Doc. No. 99-2, PageID# 1034, ¶ 6; Doc. No. 100-1, PageID# 1144, ¶ 6) and the length of the trial itself. *See H.S. II*, 2016 WL 7048840, *4, 6. Further, there is reason to question whether an earlier start to the ICPC process would have been reasonable—in state court, Kenyon testified that "she did not immediately begin the ICPC process because the initial goal was to return the Child to Mother if possible, despite the requirement to maintain a concurrent goal of . . . exit custody to relative as a result of the nature of the case." *H.S. I*, 2016 WL 3209444, at *3. Felicia Harris testified that "they initiated the ICPC process when Mother failed to achieve stability." *Id.* Their testimony is consistent with Marble's concession that a relative placement was an "alternate" or "secondary" goal of the permanency plan (Doc. No. 88, PageID# 763, ¶ 48a; Doc. No. 99, PageID# 1014) and that, during the fall of 2013, it was Marble's understanding "that DCS intended to reunite the child with the child's mother and that he would be able to set up visitation or otherwise provide care for his child after this matter had been resolved." (Doc. No. 88, PageID# 766, ¶ 50.)

*Tenn., Dep't of Children's Servs. v. E.G.P.*, No. E2003-00433-COA-R3-CV, 2003 WL 22134896, *3 (Tenn. Ct. App. Sept. 12, 2003).) To support that assertion, Marble cites Tennessee Code Annotated § 37-1-129(e)(1) which provides:

> Any order of the court that places custody of a child with [DCS] shall empower [DCS] to select any specific residential or treatment placements or programs for the child according to the determination made by the department, its employees, agents or contractors.

Tenn. Code Ann. § 37-1-129(e)(1) (amended in 2017).[14] Marble emphasizes that, under this statute, a court may hold a hearing to review a residential placement decision DCS has made, but "may only make 'recommendations' to the department even after this hearing." (Doc. No. 99, PageID# 1015 n.3 (quoting Tenn. Code Ann. § 37-1-129(e)(2).) Therefore, Marble reasons, DCS had "full discretion" regarding placement of H.S., and its failure to keep her in Marble's family constituted a choice not to make a reasonable accommodation. (Doc. No. 129, PageID# 1388.)

In their supplemental brief, Defendants respond that Marble cannot establish that the duty to keep H.S. in the family "exists in the face of a facially valid court order from the Tennessee court prohibiting placement of the child out-of-state." (Doc. No. 130, PageID# 1395.) Defendants argue that, even if the court's denial of DCS's motion to place H.S. with the DuBoises was mistaken, "the proper avenue to dispute the decision was an appeal" and that DCS should not have been expected to "flout[] the order and risk[] contempt of court." (*Id.*) Marble did appeal that decision, but argued only that "the court erred in not placing [H.S.] in [the custody of the DuBoises]," and not that the court's order was non-binding with respect to DCS. *H.S. II*, 2016 WL 7048840, at *9. His appeal was not successful.

---

[14]    Tennessee Code Annotated § 37-1-129(c)(1) now contains the language Marble cites. *See* Tenn. Code Ann. § 37-1-129(c)(1).

Marble has failed to show that placing H.S. with the DuBoises after DCS's initial attempts to do so were denied by the Tennessee courts remained a reasonable accommodation. The question of Tennessee law that Marble has raised about whether that court was wrong to order, rather than recommend, that H.S. not be placed with the DuBoises (Doc. No. 129, PageID# 1388), is not material to the ADA analysis of whether a relative placement was a reasonable accommodation despite the juvenile court's order blocking it.[15]

To the extent that Marble argues as a separate claim that DCS's failure to conduct an individualized inquiry violates the ADA and Section 504, that claim also fails. The parties debate

---

[15] In his amended complaint, Marble makes several allegations (abandoned in his summary judgment briefing) regarding DCS's conduct during the dependency and neglect proceeding in the circuit court. Marble claims that: (1) "DCS expressly opposed the transfer of the child to the aunt and declared that the court should have a 'best interest' hearing between the Camelot Care foster parents and the child's blood relative" (Doc. No. 88, PageID# 752, ¶ f); (2) "DCS filed in Circuit Court a motion to dismiss [Marble's] de novo appeal on the adjudication of the dependency and neglect, arguing that [that] issue was now 'moot' since his parental rights had been terminated on April 30, 2015" (*id.* at PageID# 784, ¶ 93); and (3) despite having seen the Gordon Letter, "DCS stonewalled [Marble] in Circuit Court, arguing that his de novo appeal was stayed" (*id.* at PageID# 786, ¶ 98). In their answer, Defendants deny those allegations. (Doc. No. 89, PageID# 804, ¶ 16(f); 816, ¶ 93; 817, ¶ 98.) The only evidence in the record relating to DCS's conduct in the circuit court is the conclusory assertion of Marble's attorney Connie Reguli that, "[d]espite having ample opportunity to review [the Gordon Letter]," which was filed in circuit court on May 5, 2015, "[DCS] continued their course of action to deny relative placement of H.S. with Bobbi DuBoise and Will DuBoise, Jr." (Doc. No. 99-5, PageID# 1063, ¶¶ 3, 4.) At the summary judgment stage, Marble cannot rest on the allegations in his complaint to establish the presence of a material factual dispute, and therefore those allegations have no weight. *See Everson v. Leis*, 556 F.3d 484, 496 (6th Cir. 2009).

However, the Court does note that the TCA dependency and neglect opinion reflects that, at the conclusion of the trial in circuit court, Kenyon no longer supported placing H.S. with the DuBoises and instead believed that "it was in [H.S.'s] best interest to remain with Foster Parents." *H.S. II*, 2016 WL 7048840, at *5. "Ms. Kenyon opined that [H.S.] would be traumatized if she were removed." *Id.* Further, DCS "noted that [H.S.] was well cared for and happy with Foster Parents, who were financially secure and willing to adopt [H.S.] if that proved to be an option." *Id.* In the absence of any argument from Marble explaining why DCS's change of position was wrong, and therefore that a relative placement was still a reasonable accommodation (despite concerns about H.S.'s well-being), the Court cannot find that Marble has established that there is a material factual dispute about whether DCS refused to reasonably accommodate him.

whether DCS conducted an individualized inquiry into the effect of Marble's disabilities on his compliance with the permanency plan. Defendants state that "Marble's [permanency] plan was directly tailored to his abilities and the child's needs" and was created "by sitting down with the parent and assessing that particular parent-child relationship and what is needed for the child to safely and securely reunite with the parent." (Doc. No. 98, PageID# 842–43.) Marble responds[16] that "[t]here is nothing in Kenyon's testimony accounting for the known disabilities of Marble and how they would affect his ability to meet the requirements of becoming a safe and effective parent." (Doc. No. 99, PageID# 1016.)

Marble has failed to "come forward with specific facts demonstrating that there is a genuine issue for trial" on this claim. *Roberson*, 252 F. Supp. 2d at 576. Again, the dispute about whether DCS made an individualized inquiry into the relationship between Marble's disabilities and the terms of the permanency plan is not material to Defendants' liability where Marble has pointed to nothing in the record indicating that he ever requested a reasonable accommodation from DCS or that such an accommodation was otherwise possible. *See Rorrer*, 743 F.3d at 1041; *see also Keith*, 703 F.3d at 929. Defendants are entitled to summary judgment on all aspects of Marble's reasonable accommodation claim.

---

[16] In support of his argument, Marble cites a section of the ADA and case law that are relevant when there is a question about whether the plaintiff has a "disability" within the meaning of the Act. (Doc. No. 99, PageID# 1016 (citing 42 U.S.C. § 12102(2)).) For the purpose of their summary judgment motion, Defendants concede that Marble's conditions "qualify as disabilities under the ADA" (Doc. No. 98, PageID# 840) and therefore Marble's argument about the individualized inquiry that is required when determining whether the plaintiff has a "disability" is not relevant. (*See* Doc. No. 99, PageID# 1016.)

## IV. Conclusion

For the foregoing reasons, Defendants' motion for summary judgment will be granted and this action will be dismissed with prejudice. A separate order will enter.

Entered June 7, 2018.

ALISTAIR E. NEWBERN
United States Magistrate Judge